Thomas **PULAKIS**, Appellant,

v.

**STATE** of Alaska, Appellee.

No. 1108.

Supreme Court of Alaska.

Nov. 9, 1970.

R. Collin Middleton Asst. Public Defender, for appellant.

R. Collin Middleton, Ketchikan, for appellant.

Benjamin O. Walters, Jr., Asst. Dist. Atty., Harold W. Tobey, Dist. Atty., and G. Kent Edwards, Atty. Gen., for appellee.

## OPINION

Before BONEY, C. J., DIMOND, RABINOWITZ, and CONNOR, JJ., and FITZGERALD, Superior Court Judge.

RABINOWITZ, Justice.

In this appeal, appellant asks us to reverse his conviction of the crime of larceny. The principal ground advanced by appellant

is that it was plain error on the trial court's part to have admitted into evidence the results of polygraph examinations which were given to him prior to trial. Appellant further claims that he should have been granted a judgment of acquittal because the prosecution failed to produce sufficient corroborative evidence of the testimony of its chief witness, an alleged accomplice. Appellant also argues that the entry of judgment of acquittal was required because the prosecution failed to prove that the victim of the larceny owned the property alleged to have been stolen. We affirm the judgment and commitment entered by the superior court.

 Turning first to the two subsidiary issues in this appeal, we believe that our opinion in Stewart v. State [1] requires rejection of appellant's position that the state must prove, as an essential element of the crime of larceny, ownership of the property allegedly stolen. In *Stewart,* we said:

> Concerning appellant's contention that the indictment was insufficient because of its failure to specify that the Super S Store was an entity capable of owning property, we hold that such an allegation is unnecessary. All that is required to be alleged in this regard in charging the crime of larceny in a building are facts showing that the property taken was not the property of the accused.[2]

The "property of another" phrase in larceny statutes ordinarily refers to possession, not title, because the gravamen of the offense is the interference with another's possession of property.[3] In the case at bar, the prosecution's evidence sufficiently established that the ring in question was taken without the consent of its possessor, the McKinley Gift Shop. Under Alaska's larceny statutes, the prosecution's proof was sufficient.

In his second specification of error, appellant asserts that the state's evidence was legally insufficient to corroborate the testimony of the accomplice Renee La Cour. Appellant argues that apart from the inadmissible results of the lie detector tests, which were administered to appellant, the corroborative evidence did not sufficiently connect appellant with the commission of the larceny.[4] In support of this argument, appellant relies upon the decision of the Ninth Circuit in Ing v. United States.[5] There the court said in part:

> [T]he rule appears to be well established that the corroborative evidence must be considered without the aid of the testimony to be corroborated, and that such corroborating evidence must connect or tend to connect the accused with the commission of the crime with which he is charged. * * * Such testimony is not sufficient if it requires the interpretation and direction of the testimony to be corroborated. * * * The facts and circumstances relied upon in this case for corroboration do no more than show an opportunity for the appellants to have committed the crimes or connect them with the perpetrators.[6]

---

1. 438 P.2d 387 (Alaska 1968).

2. *Id.* at 391 (footnote omitted). In the *Stewart* case, the appellant was charged with the crime of larceny in a building under AS 11.20.150. This statute reads in part: "A person who commits the crime of larceny in a * * * building * * *." In the case at bar, appellant Pulakis was indicted for the crime of larceny under AS 11.20.140 which makes it a crime for any person to steal "the property of another."

3. R. Perkins, Criminal Law 195–96 (1957); 2 R. Anderson, Wharton's Criminal Law & Procedure § 497 (1957).

4. AS 12.45.020 provides:
 A conviction shall not be had on the testimony of an accomplice unless it is corroborated by other evidence which tends to connect the defendant with the commission of the crime; and the corroboration is not sufficient if it merely shows the commission of the crime or the circumstances of the commission.

5. 278 F.2d 362 (9th Cir. 1960).

6. *Id.* at 367.

One year after *Ing* was decided, this court in Oxenberg v. State [7] rejected *sub silentio Ing's* analysis of Alaska's accomplice corroboration statute. In *Oxenberg,* we held that it was

> impracticable to require that what the accomplice has said be put aside and that the other evidence be examined alone to see if it 'tends to connect the defendant with the commission of the crime.' * * [C]orroborative evidence ought to be viewed in relation to, rather than apart from, the accomplice's narrative in order that it might be fairly and rationally appraised for whatever worth it may have.[8]

*Oxenberg* elucidates the AS 12.45.020 language, "tends to connect." We said that if the corroborative evidence

> can be brought into contact with the circumstances related by the accomplice, and if at all points of contact there is consistency and harmony, rather than incongruity and discord, then there is good ground for presuming that what the accomplice said was true. * * * The corroborative evidence fulfills the requirement that it tend to connect the defendant with the commission of the crime because it will 'serve as a means' of inducing in the minds of the jurors a rational belief that the accomplice was speaking the truth when he implicated the defendant in the criminal event.[9]

We have consistently adhered to *Oxenberg's* criteria.[10] Our most recent reliance upon *Oxenberg* is found in Dimmick v. State.[11] There we said:

> The statutory requirement of corroboration is based on an assumption that

an accomplice might falsely accuse others of a crime in order to purchase for himself immunity from punishment. This assumption is dispelled and the statutory requirement satisfied when the corroborating evidence tends to induce in the minds of the jurors a rational belief that the accomplice was speaking the truth when he implicated the defendant in the criminal event.[12]

We conclude that the state's corroborative evidence, apart from the results of the lie detector tests which appellant underwent, tended to induce a rational belief that the accomplice testified truthfully when she implicated appellant in the commission of the larceny in question.[13] We therefore hold that the trial court did not err in denying appellant's motion for judgment of acquittal.

This brings us to the crux of this appeal. Appellant argues that it was plain error for the trial court to have admitted testimony and a written report concerning the results of lie detector tests given him. While represented by counsel, appellant, prior to trial, consented to take a polygraph examination.[14] Pursuant to his consent, appellant was subjected to two polygraph examinations. During the impanelling of the trial jury, appellant's counsel inquired of the entire prospective panel whether anyone had ever taken a lie detector test. One prospective juror answered in the affirmative and in the presence of the panel, appellant's counsel then elicited an opinion from the juror that he did not believe polygraph machines

---

7. 362 P.2d 893 (Alaska 1961).

8. *Id.* at 896–897 (footnote omitted).

9. *Id.* at 897 (footnote omitted).

10. Merrill v. State, 423 P.2d 686, 700 (Alaska 1967); Thomas v. State, 391 P. 2d 18, 23 (Alaska 1964); Braham v. State, 376 P.2d 714 (Alaska 1962); Mahle v. State, 371 P.2d 21, 26 (Alaska 1962).

11. 473 P.2d 616 (Alaska 1970).

12. *Id.* at 617 (footnotes omitted).

13. Our holding renders unnecessary any decision whether evidence of the results of lie detector tests can be looked to as corroborative of an accomplice's testimony.

14. Counsel for appellant in this appeal did not represent appellant at any stage of the proceedings in the lower court.

to be infallible.[15] Counsel for appellant then asked the entire panel if they had done any reading on the subject of polygraph machines. One prospective juror answered in the affirmative and in the presence of the entire panel related that she was left with "a very unfavorable impression" of polygraph machines on the basis of her reading. In his opening statement to the jury, appellant's trial counsel stated that the polygraph examinations in question were not of value.

As part of its case in chief, the prosecution called Sergeant Anderson of the Anchorage Police Department. Without objection from defense counsel, Sergeant Anderson was accepted as a qualified polygraph examiner. Anderson then testified, again without objection, as to the circumstances surrounding his administration of two separate polygraph examinations to appellant. Anderson testified that in his opinion the examinations revealed that deceptive answers were given to four crucial questions. No objection was made to this opinion evidence nor was any motion subsequently made to strike any portion of Sergeant Anderson's testimony. Instead, during the state's direct examination of the witness, counsel for appellant explicitly stated that he had no objection to the introduction into evidence of Sergeant Anderson's written report of appellant's polygraph examinations. Appellant's counsel also cross-examined Sergeant Anderson

to a considerable extent concerning the general inadmissibility of polygraph results in the courts.[16]

Prior to the conclusion of the trial, appellant's counsel requested the following instruction which was subsequently given by the trial court in its charge to the jury:

The results of a test by a polygraph machine, commonly called a lie detector, have been admitted by stipulation by the State and the Defendant. The polygraph is a scientific instrument which records certain physiological phenomena, such as changes in the pulse rate, blood pressure, and respiration. The polygraph machine has not yet achieved scientific reliability and is not an instrument that automatically and unerringly discloses a lie by the person being tested.[17]

In Gafford v. State, we said by way of dicta, "The general rule is that the results of polygraph tests are not admissible in evidence."[18] In the case at bar, the manner in which the issue of polygraph reliability has been raised calls for a more detailed discussion of the subject.

The polygraph machine ordinarily consists of a cardiograph which registers pulse rate, a sphygmograph which measures blood pressure, a pneumograph which measures respiration, and usually a galvanometer which measures electrodermal re-

15. Appellant's counsel asked this same juror during voir dire:
[C]ould you follow the court's instructions which I'm sure Judge Davis will give regarding lie detectors and divorce from your mind any previous knowledge that you may have acquired either firsthand or secondhand by books and talking to people. * * *

16. In his cross-examination of Anderson, appellant's counsel obtained the witness' admission that one cannot prove guilt or innocence by a polygraph machine; that deception detection through the use of polygraph machines is not an exact science; and that it is possible for innocent persons to show unfavorable physical reactions.

17. Appellant's counsel also requested the following instruction which was given by the trial court:
A duly qualified expert gave his opinion on questions in controversy at this trial. To assist you in deciding such questions, you may consider the opinion with the reasons stated therefor, if any, by the expert who gave the opinion. You are not bound to accept the opinion of the expert as conclusive. Give it the weight you feel it is entitled. You may disregard any opinion, if you find it to be unreasonable.

18. 440 P.2d 405, 410 (Alaska 1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 125 (1969).

sponses.[19] The theory for using the polygraph to detect lies is that the act of lying causes conscious conflict in the mind of the examinee, which produces an emotion of fear or anxiety, manifested by fluctuations in pulse rate, blood pressure, breathing, and perspiration.[20]

As we said in *Gafford*, the general rule precludes admission of the results of polygraph tests. The authority usually cited as the first reported American case holding such evidence inadmissible is Frye v. United States.[21] In *Frye*, the court said of expert testimony based on a test of blood pressure fluctuations (really a monograph rather than a polygraph):

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

> We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made.[22]

Judicial antipathy towards the admissibility of polygraph evidence continues.[23] Inadmissibility is the general rule, though some jurisdictions make an exception if the polygraph evidence was received at trial pursuant to stipulation.[24] The decisions reflect a high degree of sensitivity to the numerous potential sources of error in the ascertainment of deception through polygraph examinations.[25] The most thorough analysis of sources of error in polygraph procedures is found in Skolnick,

19. Henderson v. State, 94 Okl.Crim. 45, 230 P.2d 495, 501 (1951) ; Kleinfeld, The Detection of Deception–A Resume, 8 Fed.B.J. 153 (1947). Laboratory experimenters generally regard galvanic skin response as the best indicator of deception, but field examiners generally do not; possible galvanic skin response is the only indicator sensitive enough for laboratory experiments on subjects who do not care much whether they succeed in deceiving the experimenter, but is too sensitive for the intensely emotional circumstances of real life interrogations. Thackray & Orne, A Comparison of Physiological Indices In Detection of Deception, 4 Psychophysiology 329 (1968).

20. Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie Detection, 70 Yale L.J. 694, 699–700 (1961).

21. 54 App.D.C. 46, 293 F. 1013 (1923).

22. *Id.* at 1014.

23. The relevant history and authorities are well summarized in State v. Valdez, 91 Ariz. 274, 371 P.2d 894 (1962).

24. *Id. See also* State v. McNamara, 252 Iowa 19, 104 N.W.2d 568 (1960) ; People v. Houser, 85 Cal.App.2d 686, 193 P.2d

937 (1948). *Contra,* State v. Trimble, 68 N.M. 406, 362 P.2d 788 (1961) ; Le Fevre v. State, 242 Wisc. 416, 8 N.W. 2d 288 (1943).

25. Typical of this judicial concern is the court's opinion in Henderson v. State, 94 Okl.Crim. 45, 230 P.2d 495, 501–02 (1951). In that case, the court refers to Professor Inbau's conclusions as to the factors responsible for errors in polygraph examinations. Professor Inbau's factors fall in five broad categories: (1) emotional tension; (2) physiological abnormalities; (3) mental abnormalities; (4) unresponsiveness in a lying or guilty subject; and (5) unobserved muscular movements which produce ambiguities or misleading indications in the blood pressure tracing.

Another potential source of error is the competency of the examiner. Though such an estimate is necessarily only a guess, one frequently reads that no more than 10 percent of all polygraph examiners are competent. Highleyman, The Deceptive Certainty of the "Lie Detector," 10 Hastings L.J. 47, 51–61 (1958) ; *see also* Pfaff, The Polygraph: An Invaluable Judicial Aid, 50 A.B.A.J. 1130 (1964).

Scientific Theory and Scientific Evidence: An Analysis of Lie Detection, 70 Yale L.J. 694 (1961).[26]

The central problem regarding admissibility is not that polygraph evidence has been proved unreliable, but that polygraph proponents have not yet developed persuasive data demonstrating its reliability. Little worthwhile experimentation has been done to determine the reliability of polygraph evidence.[27] This is not to say that the worth of polygraph evidence cannot ever be proved to the satisfaction of this court. Two approaches which courts might find persuasive are (1) surveys of the opinions of experts familiar with polygraphs as to their usefulness in detection of deception,[28] and (2) experiments yielding meaningful data on the accuracy of polygraph examiners' opinions as to the veracity of the examinees.[29] On the basis of our study of the relevant literature, we are not prepared to say whether polygraph examiners' opinions are reliable. Judicial acceptance of polygraph tests must await the results of more persuasive experimental proof of reliability.

On the basis of our study of the judicial authority and academic literature in this area, we conclude that the results of polygraph examinations should not be received in evidence over objection. Even if no objection has been tendered, the trial court ordinarily should reject such evidence. A stipulation for admission does not increase the reliability of polygraph results and therefore should not lead to any deviation from the exclusionary policy.

This does not mean that we find polygraph tests so demonstrably unreliable as to require a finding of plain error even in the circumstances of the record in the case at bar. In this particular case, we conclude that appellant waived any objection to Sergeant Anderson's opinion testimony and also waived any objection to the written report of the results of the polygraph examinations.[30] It appears that counsel's strategy was to permit the polygraph examiner's opinion to be received into evidence because he thought his client would be benefited by the jury's knowledge of his consent to be tested more than he would be harmed by the results of the tests. In his final argument appellant's

26. *See also* Levitt, Scientific Evaluation of the "Lie Detector," 40 Iowa L.Rev. 440 (1955). Levitt lists the following sources of error: (1) bias on the part of the examiner; (2) misleading cues given by the examiner; (3) psychopathology in the suspect; (4) physiopathology in the suspects; (5) acute tension on the part of an innocent suspect; (6) intensive interrogation prior to testing; (7) muscular movement or pressures; (8) multiplicity of deception criteria; and (9) insufficient training of the examiner.

27. Levitt, Scientific Evaluation of the "Lie Detector," 40 Iowa L.Rev. 440, 450 (1955).

28. *See* Cureton, A Consensus as to the Validity of Polygraph Procedures, 22 Tenn.L.Rev. 728 (1953). The author concluded that there was no consensus among those polled as to the efficacy of polygraph examinations.

29. For data to be meaningful, it must disclose how frequently polygraph examiners are correct and how frequently they are incorrect when they report that subjects are lying or telling the truth. Since a greater proportion of examiners' opinions are probably correct when they are permitted to abstain from giving opinions when they are at all uncertain, the data should reveal in what proportion of cases surveyed the examiners were unable to state opinions. Experiments will be difficult to design in such a way that their results will be generalizable to criminal investigation, and scientfic research to obtain meaningful data will be difficult to perform on actual cases of criminal investigation. The attempted solution of these problems must be left to those who are competent in the techniques of social science. Once we are provided with meaningful data on the accuracy of polygraph examiners' opinions, we may reconsider the difficult decision as to whether they are sufficiently reliable to be admitted as evidence and are otherwise unobjectionable.

30. Cadzow v. State, 471 P.2d 404 (Alaska 1970).

counsel told the jury that the defense did not have any objection to Sergeant Anderson's opinion testimony concerning the results of appellant's polygraph examinations. Explaining why he did not object to Sergeant Anderson's testimony, defense counsel argued, "It's very simple, guilty people don't voluntarily take lie detector tests nor do they testify."

Criminal Rule 47(b) provides that "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The plain error rule is inapplicable where failure to object at the trial court level amounted to an intelligent waiver of a known right.[31] In Rank v. State,[32] appellant argued that admission of testimony that he refused to take a lie detector test was plain error; we rejected this contention on the ground that his attorney's extensive cross-examination on the subject manifested an intelligent waiver of a known right. In light of the relevant portions of the record in the case at bar which we have referred to, we think that Pulakis' counsel's actions throughout the course of the trial below present a more compelling factual situation for finding an intelligent waiver of a known right than existed in *Rank*.[33]

In Gafford v. State,[34] we held that appellant could not raise on appeal the trial court's error in failing to instruct the jury to disregard a reference to a lie detector test where counsel below informed the court that defendant chose not to request such an instruction. In the case at bar, we think the course of conduct of appellant's trial counsel comes within the ambit of the *Gafford* rule and precludes appellant from raising any issue pertaining to Sergeant Anderson's opinion testimony, as well as the written report of the polygraph examinations.

As we have pointed out earlier, the strategy adopted by appellant's trial counsel was centered around allowing, not excluding, the polygraph evidence. Counsel for appellant questioned the prospective jurors intensively on the subject of polygraph examinations, and he elicited responses favorable to appellant's position. In his opening statement and closing argument, trial counsel minimized the importance of the evidence. No objection was made to the qualifications of the expert witness or to the admissibility of the testimony. In fact, counsel stated explicitly that there was no objection to the admission of the written report of the expert witness. On cross-examination, appellant's counsel obtained significant admissions from the expert about the unreliability of the polygraph test. Highly favorable jury instructions were requested and were given by the court.

We think that this entire pattern of events demonstrates a clear, intelligent waiver of any privilege to exclude this evidence.

Affirmed.

31. Hammonds v. State, 442 P.2d 39, 43 (Alaska 1968).

32. 373 P.2d 734, 735–736 (Alaska 1962).

'3. In Rank v. State, 373 P.2d 734, 736 (Alaska 1962), we said:
 During the trial Rank had presumably taken the position that to explore' the subject in detail would be advantageous to his cause. In this court he adopts the totally inconsistent position that he has suffered a grave disadvantage. We hold that he is bound by the choice he first made in the court below.

34. 440 P.2d 405, 410 (Alaska 1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 125 (1969).