Marvin L. TROYER, Calvin L. Vincent, and Gerald B. McGahan, Appellants,

v.

STATE of Alaska, Appellee.

Nos. 4315–4317.

Supreme Court of Alaska.

July 25, 1980.

Deborah Paquette, Asst. Public Defender, Brian Shortell, Public Defender, Anchorage, for appellants.

Thomas M. Wardell, Dist. Atty., Kenai, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

BOOCHEVER, Justice.

Marvin Troyer, Calvin Vincent and Gerald McGahan (hereinafter defendants) appeal their convictions for burglary not in a dwelling. The central issue in this case is whether Troyer and Vincent made confessions at the scene of their arrest. Since we hold that there is substantial evidence to support the trial court's finding that no confessions were made at the scene of the defendants' arrest, we do not address their contention that these alleged confessions were made involuntarily. This holding disposes of all three of the appellants' contentions that their subsequent confessions made at the trooper station were illegal fruits of the alleged earlier confessions.

The facts surrounding the defendants' arrest were developed at an evidentiary hearing held before the trial court. At approximately 11:00 p. m. on January 26, 1977, Troopers Schadel and Lawrence were on a stake-out at Tustumena School to apprehend possible burglars.[1] After the troopers had waited approximately one hour, Troyer and Vincent entered the building. Troyer saw Schadel and fled toward the door. Yelling, "Halt!", Schadel pursued with his .45 caliber semi-automatic pistol drawn. From this point the testimony diverges. The officers' version is presented first.

[1] Numerous other schools had been burglarized.

Vincent knocked Schadel out the door. Lawrence, following in pursuit, attempted to shoot Vincent because he thought that Vincent had a long object[2] in his hand which appeared to be a weapon, and that Vincent might attack. But the gun did not fire because he neglected to take the safety off. Lawrence ejected the bullet, and after moving another into the chamber, attempted to fire again, but failed.

Lawrence told the defendants to hit the floor, which they did. Troyer put his hands behind his head. Schadel came back into the building. While Vincent was lying on the floor, Schadel struck Vincent in the buttocks with a flashlight.[3] Additionally, Vincent was struck when he attempted to get up from his prone position. Lawrence testified that Schadel grabbed Vincent's hands behind his head, and because of Vincent's sudden reaction, his head stuck the floor. Lawrence testified that Vincent's nose was red, but he did not "recall it being bloody."

Although the officers had only one pair of handcuffs, they did not handcuff the two together. Troyer was handcuffed, and Vincent kept his hands above his head. Vincent was handcuffed later, when Trooper Kilpatrick arrived. At some point, they were given the *Miranda* warnings.

Schadel guarded the pair while Lawrence retrieved his shotgun. Eventually, Schadel went to investigate the defendants' car. During that time, Lawrence guarded the defendants with his shotgun. Although Lawrence testified that he told them not to move or he would blow their heads off, he denied making any other threats.[4] Though he thought that they were involved in the other burglaries, he did not question the defendants about them. Schadel also stated that he did not hear the defendants make any statements to Lawrence or Kilpatrick regarding other burglaries.[5]

Later, the defendants were transported to the trooper station in Soldotna, where they were interrogated by Trooper Sumey. They made detailed confessions concerning their involvement in other burglaries. Trooper Sumey testified that during his interrogation of Troyer and Vincent they did not mention that they had previously made any admission regarding other burglaries to Lawrence or anybody else.[6] Their confessions implicated Gerald McGahan. When confronted with their statements, McGahan also confessed.

The defendants' version differed with regard to the following material facts. While Vincent was lying on the floor, Schadel hit Vincent in the middle of the back with a hammer which Schadel had found in Vincent's coat pocket. Then Schadel stuck his knee in Vincent's back, grabbed his hair, and smashed his face on the concrete a couple of times. This resulted in a cut lip and bloody nose. Troyer was also pushed around a little bit. Troyer and Vincent were "shook . . . down" and searched, dragged together and handcuffed to each other, and made to lie face down.

Troyer testified that while Lawrence was guarding them, he held a shotgun at his head and "asked us questions and told us if we didn't talk he could make it look like we were trying to get away and he could blow our heads off . . . ." Both defendants testified that Lawrence essentially stated, "I'll blow your fucking brains out" if they did not talk. Additionally, Lawrence told them that they were lucky to be alive, since he had tried to shoot them.

2. Lawrence stated the object was subsequently identified as a screwdriver. Vincent denied having a screwdriver.

3. Vincent did not recall a flashlight.

4. Lawrence specifically denied that he threatened to blow their heads off if they did not talk, or that he stated that he would pretend he was jumped and kill them.

5. Schadel had previously testified that the defendants had stated that "they didn't know anything about any other burglaries. . . . Those statements came after the lieutenant [Lawrence] posed a question to them . . . .—something to the fact that you've—you've caused us a lot of problems or misery in the last couple months . . . ."

6. Sumey testified, however, that he did not know if any prior confessions had been made.

Although they had earlier denied any involvement in other school burglaries, under Lawrence's questioning they both confessed to committing several burglaries. Both confessed because they did not want to be shot and they were scared. At some point, they were given the *Miranda* warnings.

At the trooper station, they made detailed confessions to Trooper Sumey because they have previously told Trooper Lawrence everything. Additionally, Vincent stated that he told Sumey that he had previously confessed at the school.

The defendants' counsel requested Richard Bartlett, an expert polygrapher, to conduct a polygraph examination of Vincent and Troyer. He tested both Troyer and Vincent twice. At the hearing, he testified concerning the results of the tests. His testimony indicated that the defendants were relating what they believed to be the truth.[7]

Following the evidentiary hearing, the trial court denied the motion to suppress. In denying the motion, the court stated:

Essentially, I've been agonizing over how in the world the young men could—under the totality of that circumstances I believe what the police officers said, and frankly, I'm inclined to believe that the young men think that what they said occurred out there. I just don't think it's

. . . .

Because I have considered the polygraph examination and I think by the time they took the polygraph exam they believed that what they are now saying occurred out there— I think that they believe that

that did occur. I don't think it occurred in that fashion. I'm sure that they were threatened—their lives were threatened. I'm sure that their faces—that one of their faces was forced into the floor rather vigorously. They may very well—one of them may have been struck in the back with either a hammer or a flashlight and I'm sure that they were—that the officer attempted to shoot one of them under the circumstances of the other officer being knocked through the door and the shotgun being brought into play and the profanity of the police officer and all of those things that those young men were frightened at the time. Very frightened at the time. But I do not think a confession was sought or obtained at the scene.

.       .       .       .       .

I've thought—you know, I've thought about this case a great, great deal. As a matter of fact, it's— I've tried to reconcile the testimony of all the witnesses on several occasions and had some difficulty trying to figure out how the boys could be saying what they're saying and the officer saying what he's saying and everyone probably be telling the truth. And I— 'cause I— I'll state for the record now that it's certainly my belief that police officers can and do lie. I know as a matter of fact that they have in the past but I believe the officers in this case. And that's where we're at. .

The trial court made a factual finding that no confessions were made at the scene of their arrest. Consequently, the trial court ruled that the state had proved by a preponderance of the evidence that the station house confessions were not coerced.

---

**7.** Bartlett asked Troyer four relevant questions. The questions and answers were: (1) Did you resist arrest in any way when you were apprehended in the Tustamina [sic] Elementary School? Answer: No. (2) Were you assaulted by arresting officers when you were arrested in the Tustamina [sic] School? Answer: Yes. (3) Were the burglary admissions made to the police because one of the arresting officers threatened to blow your heads off with a shotgun? Answer: Yes. (4) On February 25th, were you approached by a Soldotna police officer and asked to sign an affidavit saying you were not assaulted by the police? Answer: Yes.

Bartlett's opinion, based upon the absence of significant physiological reactions, was that Troyer answered the questions truthfully. Vincent answered the same questions truthfully and additionally answered the following questions truthfully: (1) Did the police strike you in the back with a hammer after you were handcuffed on the night of your arrest? Answer: Yes. (2) Was your face pushed into the floor by police causing a nosebleed after you were handcuffed? Answer: Yes. Trooper Lawrence did not take a polygraph examination.

Troyer, Vincent and McGahan entered pleas of nolo contendere to charges of burglary not in a dwelling. The pleas were conditioned on the right to appeal the suppression issues. All parties stipulated that the appeal points reserved are dispositive of the case in accordance with *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974), and *Oveson v. Municipality of Anchorage*, 574 P.2d 801 (Alaska 1978). All three defendants have appealed the trial court's denial of the motion to suppress. Additionally, Troyer and Vincent contend that their sentences are excessive.

After oral argument, we entered an order remanding the case for "the purpose of requesting the judge to reconsider his finding." We remanded because it seemed highly improbable that Troyer and Vincent could each independently relate similar accounts about the events surrounding their confessions and each mistakenly believe he was telling the truth.[8]

The trial court entered findings on remand. The trial court believed that all three police officers testified truthfully, and found their version "wholly credible." He noted that Trooper Sumey, who was not at the scene of the arrest and had no reason to have "an emotional reaction" to the defendants, testified that during his interviews with the participants neither the defendants nor the arresting officers informed him of any prior statements. The judge found it highly unlikely that all of the

alleged admissions and confessions could have occurred without one of the participants mentioning it to Sumey. The trial court admitted having continued difficulty reconciling his belief that the polygraphist was correct in stating that the defendants answered the questions truthfully with the court's certainty that, if truthful, the defendants' version was mistaken. The court noted that there was a full month between the date of the defendants' release from jail and February 28, 1977, when they took the polygraph test, and that the "defendants had had time to think about, to discuss, and to write down what they recalled of the events before taking the polygraph examination." The judge found that it might well be that the subjective beliefs of the defendants at the time they submitted to the polygraph test were based on their reconstruction of the events which they had come to believe thoroughly. The court concluded that the state had proven the confessions voluntary by substantially more than a preponderance of the evidence. With this finding in mind, we now review the defendants' contentions.

## I. THE ALLEGED SCHOOL HOUSE CONFESSIONS

The defendants contend that there is not substantial evidence to support the trial court's finding that no confessions were made at the school. We believe that, under any standard,[9] if confessions were made at

---

**8.** The trial court was of the opinion that both were telling the truth.

**9.** The defendants argue that the proper standard for determining the voluntariness of the confessions is that the state must show that a confession is voluntary beyond a reasonable doubt. In *Lego v. Twomey*, 404 U.S. 477, 489, 30 L.Ed.2d 618, 627 (1972), the United States Supreme Court adopted the preponderance-of-the-evidence standard for determining the voluntariness of a confession. The Court noted, however, that the states are free to adopt a higher standard. Although we have consistently held that the prosecution has the burden of showing that a confession was voluntary by a preponderance of the evidence, we have never discussed what standard is appropriate. *See Sprague v. State*, 590 P.2d 410, 413 (Alaska 1979); *Hampton v. State*, 569 P.2d 138, 141 n.6

(Alaska 1977); *Schade v. State*, 512 P.2d 907, 917 (Alaska 1973); *Martel v. State*, 511 P.2d 1055, 1056 (Alaska 1973). We specifically noted in *Sprague* that the appellant did "not argue for adoption of a higher standard." 590 P.2d at 413 n.7. *See also Martel v. State*, 511 P.2d 1055, 1056 (Alaska 1973). Since we hold that there is substantial evidence to support the finding that no confessions were made, we need not determine what the appropriate standard is for determining the voluntariness of a confession. We note, however, that since *Lego*, several state courts have adopted the higher standard. *See People v. Jimenez*, 21 Cal.3d 595, 147 Cal.Rptr. 172, 175–79, 580 P.2d 672, 675–79 (Cal.1978); *Ortiz v. State*, 356 N.E.2d 1188, 1191 (Ind.1976); *State v. Stone*, 397 A.2d 989, 995 (Me.1979); *State v. Phinney*, 370 A.2d 1153, 1154 (N.H.1979); *State v. Lyons*, 269 N.W.2d 124, 126 (S.D.1978); *State*

the school in the manner contended by the defendants, those confessions should have been suppressed and the confessions made at the trooper's station should also have been suppressed as the fruits of the earlier confession. We hold, however, that there was sufficient evidence to support the trial court's finding that no confessions were made at the school. Accordingly, we are not confronted with the issue of whether those alleged confessions were made involuntarily and whether the subsequent confessions must be suppressed as illegal fruits of earlier confessions.[10]

*United States v. Brown*, 557 F.2d 541 (6th Cir. 1977), makes clear the difference between the appellate scope of review of the factual question whether a confession was, in fact, made, and of the mixed factual and legal question whether the confession was entered voluntarily.

The inquiry whether, in a particular case, a confession was voluntarily or involuntarily made involves, at the least, a three-phase process. First, there is the business of finding the crude historical facts, the external, "phenomenological" occurrences and events surrounding the confession. Second, because the concept of "voluntariness" is one which concerns a mental state, there is the imaginative recreation, largely inferential, of internal "psychological" fact. Third, there is the application to this psychological fact of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also, comprehend those inductions from, and anticipation of, factual circumstances. *Culoumb v. Connecticut*, 367 U.S. at [568] 603, 81 S.Ct. [1860] at 1879 [6 L.Ed.2d 1037].

As to the first phase, findings of historical fact, great deference is afforded the trier of fact because of its ability to observe the witnesses' demeanor. Resolution of testimonial conflicts and specific findings of fact by the trial court will not be disturbed on appeal unless it is clear from the record that an error has been committed. *Id.* at 603, 81 S.Ct. 1860 [at 1879]. In reviewing the second and third phases of the inquiry, determining the mental state of the accused and assessing its legal significance, appellate courts are granted greater leeway:

. . . For the mental state of involuntariness upon which the due process question turns can never be affirmatively established other than circumstantially—that is, by inference; and it cannot be competent to the trier of fact to conclude our review simply by declining to draw inferences which the historical facts can tell. *Id.* at 604–05, 81 S.Ct. at 1880.

557 F.2d at 547–48. Thus, our scope of review on the question of whether a confession was in fact made is confined to determining whether the trial court's finding was clearly erroneous;[11] on the voluntariness question, we have a duty to examine the entire record and make an independent determination.

With these principles in mind, we now proceed to determine whether the trial court was clearly erroneous in finding that no confession was made at the school. The testimony was hopelessly in conflict. Troyer and Vincent testified that they did, in fact, make confessions at the school. On the other hand, the officers testified that no

---

*v. Wallace*, 59 Wis.2d 66, 207 N.W.2d 855, 862 (1973). *But see Quick v. State*, 599 P.2d 712, 718 (Alaska 1979), a juvenile case which we decided after the briefs in the present case were filed.

10. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

11. A finding of fact is "clearly erroneous" when, although there may be evidence to support it, the reviewing court is left with the

definite and firm conviction on the entire record that a mistake has been made." *Jamison v. Consolidated Utilities, Inc.*, 576 P.2d 97, 104 n.14 (Alaska 1978); *See also Hausen v. Woodrich*, 574 P.2d 805 (Alaska 1978); *State v. Kaatz*, 572 P.2d 775 (Alaska 1977); *Martin v. Maldonado*, 572 P.2d 763 (Alaska 1977); *Chugach Electric Ass'n v. Northern Court*, 562 P.2d 1053, 1060 n.22 (Alaska 1977); *State v. Guinn*, 555 P.2d 530 (Alaska 1976).

confessions were made at the school. Vincent testified that he told Trooper Sumey at the trooper station about the prior confessions. Trooper Sumey testified that the defendants made no mention of any prior confessions, which is consistent with the arresting officers' version. The testimony of the polygraph expert supported the defendants' version. The trial court considered this testimony to the extent of indicating that he believed the defendants thought what they related was truthful.[12] Here, the trial judge's decision depended largely on the oral testimony of witnesses seen and heard by him and on inferences to be drawn from the statements made. Thus, we give due regard to his opportunity to judge the credibility of such witnesses.[13] Had we been the trier of fact, we might have concluded that confessions were made at the school. Nevertheless, given our limited scope of review of factual findings, we are not convinced that the trial judge's finding that no confessions were made at the school was clearly erroneous and it is hereby affirmed.

This conclusion disposes of the defendants' argument that the alleged confessions were made involuntarily. Furthermore, it disposes of their argument that the subsequently-obtained confessions by Troyer and Vincent at the trooper station and by McGahan should have been suppressed as fruits of the alleged confessions at the school.

## II. THE TROOPER STATION CONFESSIONS

The defendants contend that even if there were no confessions at the school, the confessions at the trooper station were, nevertheless, involuntary and inadmissible. We refuse to consider this argument because it is raised for the first time on appeal. The only contention raised by the defendants to the trial judge was that the trooper station confessions should be suppressed as fruits of the alleged earlier involuntary statements. The defendants did not contend that, in the alternative, the trooper station confessions were, in themselves, involuntary.

## III. THE SENTENCE APPEAL

Both Troyer and Vincent appeal their respective sentences as excessive. Troyer entered a plea of nolo contendere to three counts of burglary not in a dwelling. He

---

**12.** In *Pulakis v. State*, 476 P.2d 474, 479 (Alaska 1970), we concluded that results of polygraph examinations should not be received in evidence over objection. The premise underlying our decision in *Pulakis* was that "polygraph proponents have not yet developed persuasive data demonstrating its reliability. Little worthwhile experimentation has been done to determine the reliability of polygraph evidence." 476 P.2d at 479. It has been suggested that recent tests indicate the polygraph technique is a reliable process. *See* Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility in a Perjury-Plagued System*, 26 Hastings L.J. 917, 927–34 (1975). Bodine, *Polygraphs Take the Stand*, The National Law Journal, April 14, 1980, at 1, col. 1. Without sufficient foundational evidence, we are unable to make an informed decision concerning the reliability of the technique today. Here, the defendants failed to provide an evidentiary basis to establish the reliability of the polygraph technique.

On appeal, the state argues that the trial court erred in receiving the polygraph evidence because the state did not stipulate to its admission. Under the rule established in *Pulakis*, this is correct. The state, however, waived this argument since it failed to raise it at the trial court level. The state, in its opposition to the motion to admit the polygraph evidence, said:

The admissibility of polygraph testimony during the course of hearings to determine whether statements should be suppressed on the alleged basis of coercion is ultimately a matter for the discretion of the court. . . . [T]he State is not submitting herein that the polygraph testimony would be improper per se in the subject suppression hearing as it would appear to be ultimately a matter of judicial discretion as to how much weight, if any, is to be given to the polygraphist's testimony.

Having agreed that the polygraph evidence could be considered in the discretion of the court, the state has waived the right to argue that the trial court erred in receiving the polygraph evidence because the state did not stipulate to its admission. *See Moran v. Holman*, 501 P.2d 769 (Alaska 1972); *Padgett v. Theus*, 484 P.2d 697 (Alaska 1971).

**13.** *Frontier Saloon, Inc. v. Short*, 557 P.2d 779 (Alaska 1976).

was sentenced to two years on each count to run consecutively. One year of each count was suspended. The effect is a sentence of six years with three suspended. In addition, he was given five years' probation and was ordered to make restitution. Vincent entered a plea of nolo contendere to five counts of burglary not in a dwelling. He received a sentence of two years on each count to run consecutively with one year of each count suspended. Like Troyer, he was given five years' probation and was ordered to make restitution. The net effect is a sentence of ten years with five years' suspended.

Troyer was eighteen at the time of the offense, and twenty at the time of sentencing. He had no prior record. Although he was only indicted for three burglaries, the sentencing report considered his involvement in nine felony counts because it was undenied. All these offenses occurred during a one-month period, from December 29, 1976, to January 26, 1977. During the two years between the offenses and sentencing, Troyer had no police contact. In fact, the sentencing court stated, "[H]e's been doing well." He has also been employed since the time of the offenses and has no debts except for his car payment.

Vincent's record is similar to Troyer's record. Vincent was eighteen at the time of the offense and unemployed. He was involved in twelve burglaries during the same one-month period. Since his arrest, he has held various jobs, although at the time of his sentencing he was unemployed. Following his arrest for burglary, he entered a plea of guilty to a charge of disorderly conduct. The sentencing court also considered that he hit Trooper Schadel during the commission of the offense, although this was mitigated because he acted to save Troyer's life.

The defendants maintain that their sentences are excessive because the trial court failed to consider correctly the goals of penal administration outlined in *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970). Those goals are the rehabilitation of the offender, protection of the public, deterrence of the offender, and reaffirmation of societal norms. We agree with the defendants that the trial court failed to adequately consider their potential for rehabilitation. The trial court itself acknowledged that it was probably not necessary to isolate the appellants to prevent criminal conduct, and that the sentence was "probably not going to do one single thing toward [their] rehabilitation." The court's basic reason for imposing the stringent sentences was deterrence of others and reaffirmation of societal norms. Our statement in *Christian v. State*, 513 P.2d 664, 670 (Alaska 1973), is applicable:

> We believe that in imposing the sentence here too much emphasis was placed on punishment and not enough attention was given to appellant's rehabilitation potential. Certainly some imprisonment might properly be ordered, just as granting complete probation would be within the trial court's discretion.

Moreover, we have repeatedly stated that youthful first-time offenders charged with nonviolent crimes should be given a chance for reformation.[14] Since the defendants were youthful, these were their first offenses and they were nonviolent crimes, we conclude that the trial court was "clearly mistaken" in imposing these sentences.

The state argues that *Winslow v. State*, 587 P.2d 738 (Alaska 1978), demonstrates that the sentences given here are not excessive. Winslow entered pleas of guilty to three separate counts of burglary in a dwelling. He was 18 at the time of the offenses. He was given a sentence of ten

14. *See Wharton v. State*, 590 P.2d 427, 430 (Alaska 1979): "Our view of the record indicates a failure to give adequate consideration to the reformation of this youthful, first-time offender"; *Nattrass v. State*, 554 P.2d 399, 401 (Alaska 1976): "Generally we are in agreement with Nattrass's position that in the circum- stance of youthful first-time offenders, who have committed nonviolent crimes, serious consideration should be given by Alaska's trial courts to the sentencing alternatives offered by AS 12.55.085(a) [suspending imposition of sentence]."

years with five years suspended. He contended on appeal that the sentencing court placed too much emphasis on the need for deterrence and insufficient weight on the possibility of rehabilitation. A majority of this court rejected this argument and affirmed the sentence. *Winslow*, however, is significantly different from these cases. First, a burglary in a dwelling is a more serious crime than burglary not in a dwelling. More importantly, however, Winslow had an extensive criminal background, unlike Troyer and Vincent.[15]

In suggesting a sentence, we note initially that the sentences of the defendants should be more closely harmonized because their background and involvement in the crimes were very similar.[16] Under these circumstances, it was inequitable to give Vincent a sentence of ten years and Troyer a sentence of only six years. We think that the sentence for either appellant should not exceed five years with two suspended. We agree with the trial court, however, that some time to serve is justified in view of the multiple offenses.

AFFIRMED in part, REVERSED in part, and REMANDED for resentencing in accordance with the views expressed in this opinion.

---

15. The probation officer's report on *Winslow* indicated an extensive juvenile history of unlawful activities, including shoplifting, larceny and forgery. His adult record included convictions for unlawful entry, joyriding, carrying a concealed weapon, minor consuming, and a firearms violation in Seward, Alaska.

16. In response to the sentencing court's question as to why Troyer had not been charged with all the crimes, the state did not offer an adequate explanation. Although sentencing is an individualized process, persons of identical background, committing the same offenses, should receive similar sentences. *See Burleson v. State*, 543 P.2d 1195, 1202 (Alaska 1975). The court, however, may consider factors arising subsequent to the date of the original sentencing which could justify some disparity in treatment.