Alan R. CHASE, Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. 6875.

Court of Appeals of Alaska.

March 9, 1984.

operating his own small business, but rather to attract the wealthy investor seeking a way to save on taxes.

Christine S. Schleuss, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

On May 1, 1981, Alan Chase was indicted on charges of first-degree murder, first-degree sexual assault, arson, and other related charges in connection with the death of Dawn Klinkhart. Prior to and during the trial the defendant made three motions for change of venue, all of which were denied by Superior Court Judge Justin Ripley. In addition, Chase moved to suppress a statement which he made to Investigator Charles Miller, on the ground that it was given involuntarily. This motion was also denied. After a jury trial, Chase was found guilty on all counts. On April 21, 1982, Judge Ripley sentenced Chase to seventy-five years' imprisonment. The defendant appeals Judge Ripley's denial of his motion to change venue and the motion to suppress his confession. He also argues that Judge Ripley erred in denying three of his challenges for cause of prospective jurors. We affirm.

On the night of April 18, 1981, sixteen-year-old Dawn Klinkhart had a party at her home. Her parents were out of town. One of the people at the party was the defendant, Alan Chase. Chase and Klinkhart, who had never met before, apparently spent some time together during the evening. According to the statement Chase made to the police, he had consensual sexual relations with Klinkhart. He left the Klinkhart residence after midnight, but returned later. He entered the house through a side door and went up to Klinkhart's bedroom. He undressed, got into bed with Klinkhart and attempted to have sexual intercourse with her. She responded violently, hitting Chase and telling him that she was going to call the police and charge him with rape.

The two fought and ended up on the floor. Chase tied Klinkhart's neck and wrists with a pair of pantyhose. Chase said he did this to keep her from hitting him. Chase inserted a plastic container

into Klinkhart's vagina. He then went to the garage and returned with a can of paint thinner and other flammable liquids. He splashed these substances around the room, ignited them, and left the house.

Firefighters responded to the fire early on the morning of April 19, and found Klinkhart's body. An autopsy showed the cause of death to be strangulation. Klinkhart had been severely beaten, and had chemical burns on her skin. The autopsy also showed that matches used to ignite the chemicals had been dropped directly onto her body, and that the burns and other injuries had been inflicted while Klinkhart was still alive.

In an attempt to interview everyone who had been at the party, police investigators contacted Chase. An investigator noticed scratches and what appeared to be a bite mark on Chase's hand. This and other information led the police to obtain a court order requiring Chase to submit to a physical examination and to provide other physical evidence. As part of the physical examination, Dr. Thomas Richardson, a forensic odontologist, compared the bite marks on Chase's hand with impressions of Klinkhart's teeth and bite pattern. Dr. Richardson told Investigator Miller that in his opinion the marks on Chase's hand matched the impression of Klinkhart's teeth and bite pattern. Investigator Miller then talked to Chase about the bite marks and the other evidence in the case and Chase admitted to Miller that he had killed Klinkhart. Chase's defense at trial was that because he did not intend to kill Klinkhart, he was therefore only guilty of the lesser-included offense of manslaughter. The jury rejected this defense.

## CHANGE OF VENUE MOTIONS

■ Chase made several motions for a change of venue based upon AS 22.10.-040(1) which allows the court to change venue "when there is reason to believe that an impartial trial cannot be had." A change of venue may be necessary to insure the defendant's right to be tried by an impartial jury. U.S. Const.amend. VI; Alaska Const. art. 1, § 11. The standard which we apply to review a trial judge's denial of a change of venue motion is whether the denial amounted to an abuse of discretion. *Oxereok v. State*, 611 P.2d 913, 919 (Alaska 1980).

This case did receive considerable publicity. The evidence presented by the defendant shows that between the time of Klinkhart's death on April 19, 1981, and January 12, 1982, approximately three weeks prior to trial, the case received media attention at least sixty-two times. This breaks down to seventeen newspaper articles, fourteen television spots, and thirty-one radio broadcasts.

Three Alaska Supreme Court cases set forth the standards which a trial judge should apply in deciding whether to grant a defendant's motion for a change of venue due to pretrial publicity. Those cases are *Oxereok v. State*, 611 P.2d 913 (Alaska 1980); *Mallott v. State*, 608 P.2d 737 (Alaska 1980); and *Brown v. State*, 601 P.2d 221 (Alaska 1979). These cases establish that a trial judge will seldom be found to have abused his discretion in denying a motion for change of venue prior to jury *voir dire*. In *Mallott*, 608 P.2d at 746, the court stated:

Whether pretrial publicity is so prejudicial and so pervasive that no such jury could be selected to try a particular case in a particular locale is a determination that is exceedingly difficult to make prior to the questioning of potential jurors. Therefore almost without exception trial courts have been permitted the discretion to rely on voir dire rather than their own speculation as to the impact of pretrial publicity.[1] [Footnote omitted.]

■ The court in *Mallott* then set out the standard to be applied by the trial

---

1. The court in *Mallott* did caution that although a trial court is entitled to proceed with *voir dire,* the trial court should not fail to exercise the discretion conferred on it by AS 22.10.040(1) to change venue "when there is reason to believe that an impartial trial cannot be had." 608 P.2d at 746 (footnote omitted).

judge in deciding whether to grant a change of venue motion after completion of *voir dire:*

> The ultimate burden imposed on a defendant by the Supreme Court with respect to transfer of venue has been to demonstrate that pre-trial publicity actually resulted in "a partiality that could not be laid aside" in those jurors finally seated to adjudicate guilt or innocence. *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 595 (1975). Under such a standard Mallott's claim would most certainly fail, since he cannot and does not maintain that the voir dire examination of his jury panel revealed even a shred of evidence that any of the impaneled jurors were predisposed to convict him.
>
> As we have noted above however, the voir dire process is not an infallible Geiger counter of juror prejudice, and to rely excessively on its efficacy in uncovering "actual prejudice" places an unrealistic burden on a defendant. Where there has been intensive pretrial publicity, and a substantial number of venirepersons appear to have been prejudiced by the publicity, the probability that similar prejudices are shared by, but have not been extracted from, impaneled jurors cannot be ignored. We therefore adopt the A.B.A. proposal that
>
>> A motion for change of venue or continuance shall be granted whenever it is determined that, because of the dissemination of potentially prejudicial material, there is a substantial likelihood that, in the absence of such relief, a fair trial by an impartial jury cannot be had ... A showing of actual prejudice shall not be required.

*Id.* at 748, *citing* ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press § 8–3.3(c) (2d ed. Approved Draft 1978).

■ As in the *Mallott* case, the jurors who sat on Chase's jury indicated that they could be fair and impartial. The question before us is whether, from the nature of the publicity, and the nature of the responses of the jurors who comprised the entire jury panel, there was a substantial likelihood that the jury which tried Chase was not impartial. Although we have made an independent review of the record in deciding whether Chase's jury was impartial, we recognize that the trial judge has a significant advantage in being able to detect the presence or absence of juror prejudice in evaluating the circumstances surrounding the trial. *See Brown v. State*, 601 P.2d at 230.

■ We conclude that Judge Ripley did not abuse his discretion when he refused to grant the change of venue motion. Chase was tried by a group of jurors who indicated that they could be fair and whom Chase passed for cause. A great deal of the publicity in this case took place within a few weeks of the time of the incident, and Chase was tried more than eight months later. Therefore, there is a substantial chance that any negative effect of the publicity on the trial had greatly diminished by the time of trial even though there was continuing press coverage. *See Mallott v. State*, 608 P.2d at 747. We believe that it was reasonable for the trial judge to conclude, from the responses which he received in *voir dire*, that any negative effects of the publicity had worn off. Although most of the jurors had heard of the charges against Chase, most jurors could recall little of what they had heard. It appears that those potential jurors who had fairly detailed memories of the case were excused. *See Mallott v. State*, 608 P.2d at 749. Furthermore, we do not believe that the information which the jurors had been exposed to and reported consisted of "highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflamatory material...." *Id., quoting* ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press § 8–3.5(b) (2d ed. Approved Draft 1978). Had Chase's statement admitting that he killed Klinkhart been suppressed, given the number of jurors who had heard

about the case, it probably would have been an abuse of discretion for Judge Ripley to deny Chase's motion for change of venue. It appears to us from the nature of the publicity and the responses from the jurors that most of the jurors were aware of the nature of the charges against Chase and had been exposed to the fact that he had admitted killing Klinkhart. However, the jurors would have been aware of the nature of the charges before jury selection even began, and we do not see possible prior awareness of the charges as inherently prejudicial. Since Chase's statement that he killed Klinkhart was admitted at trial, the fact that the statement had been reported in the press is not as significant as if the statement had been suppressed. Although the press characterizations of the statement as a "confession" and the fact that Chase's crime had been characterized as a "torture-murder" are cause for concern, we think that it is unlikely that these press accounts had any significant impact on the trial. From the responses which the jurors made on *voir dire*, we believe that it was reasonable for the trial judge to conclude that there had been no showing that there was a "substantial likelihood that ... a fair trial by an impartial jury" could not be had. We therefore find that the trial court did not err in refusing to grant a change of venue.

## CHALLENGES FOR CAUSE

During *voir dire* examination of the prospective jurors, Chase challenged several jurors for cause. Chase now argues that Judge Ripley abused his discretion in denying three of his challenges for cause.

In *Mallott v. State*, 608 P.2d at 749, the supreme court addressed the issue of the acceptability of jurors who have been exposed to pretrial publicity and adopted the following standard from the ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press § 8–3.5(b) (2d ed. Approved Draft 1978):

> Both the degree of exposure and the prospective juror's testimony as to state of mind are relevant to the determination of acceptability. A prospective juror testifying to an inability to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective juror remembers information that will be developed in the course of the trial, or that may be inadmissible but does not create a substantial risk of impairing judgment, that person's acceptability shall turn on the credibility of testimony as to impartiality. If the formation of an opinion is admitted, the prospective juror shall be subject to challenge for cause unless the examination shows unequivocally the capacity to be impartial. A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to the prospective juror's testimony as to state of mind.

■ The commentary to this section points out that there are two situations in which disqualification is automatic: "(1) when a prospective juror claims to be unable to overcome preconceptions, and (2) when the prospective juror has seen or heard such incriminating or highly inflammatory material that any claim of impartiality cannot be credited no matter how sincere it appears to be." Commentary to ABA Standard 8–3.5(b) at 21.

■ In light of these standards, we have reviewed the *voir dire* examination of the three jurors who Chase claims should have been excused for cause. We conclude that Judge Ripley did not abuse his discretion in refusing to allow Jurors Young and Hicklin to be challenged for cause because of exposure to pretrial publicity. Juror Behm presents a closer case, and probably should have been excused for cause. However, we conclude that Judge Ripley's failure to allow the defendant to excuse Juror Behm for cause does not constitute reversible error.

In *Mallott v. State,* 608 P.2d at 749–50, the court reviewed a claim by Mallott that the trial judge improperly denied a challenge for cause. The court rejected this claim, pointing out that the trial judge had offered Mallott additional peremptory challenges and that Mallott had accepted only one additional peremptory challenge.[2] The court held that since none of the jurors Mallott unsuccessfully challenged for cause served on the jury, the trial judge had adequately protected the defendant's right to an impartial jury.

In the instant case, Chase asked for five additioal peremptory challenges. Judge Ripley granted the request and in fact ultimately gave Chase six additional challenges so that he had a total of sixteen peremptory challenges.[3] Although Chase did renew his change of venue motion at the close of jury selection, he did not request additional peremptory challenges. None of the jurors that Chase had unsuccessfully challenged for cause sat on the jury because Chase was able to challenge them peremptorily. We conclude that Judge Ripley, by granting Chase a significant number of additional peremptory challenges, allowed Chase to select an impartial jury in spite of the fact that he may have improperly denied the challenge for cause as to one of the potential jurors. We therefore find no error.

### CHASE'S STATEMENT

Chase was originally questioned as part of a routine police investigation of everyone who had been at Klinkhart's party. However, an investigator who interviewed Chase noticed what appeared to be scratches and bite marks on Chase's hand. This and other information led the police to obtain court orders requiring Chase to submit to a physical examination and provide other physical evidence.

A few days after Chase was initially questioned, Investigator Miller asked Chase to leave work and come in for more questioning. This was around 3:00 p.m. Chase was advised of his *Miranda* rights and gave oral and written waivers. He also executed a waiver authorizing the police to take physical evidence such as fingerprints and blood samples. He then gave a tape recorded statement in which he denied any involvement with Klinkhart's death.

Chase was then taken to Alaska Hospital for a physical examination. On the way he was told by Investigator Miller that there was a court order requiring him to submit to the tests. Around 5:15, two physicians examined the bite mark on Chase's hand to see if it could have been made by Klinkhart. Investigator Miller entered the examination room and the doctors left. Chase was not re-advised of his *Miranda* rights at this time, and this part of the interview was not taped. Miller told Chase that he thought the bite marks were from Klinkhart, and explained what he thought had happened. The defendant then admitted the killing. This interview lasted around forty-five minutes. The investigator then re-advised Chase of his rights and recorded a statement in which Chase once again admitted killing Klinkhart.

Chase contends that under the "totality of the circumstances" his statements at the hospital were involuntary, and should have been suppressed. "The scope of [appellate] review as to the voluntariness of a confession is twofold. The trial court's findings of fact will be reversed only if clearly erroneous. As to the trial court's determination of voluntariness, we will examine the entire record and make an independent determination." *Van Cleve v. State,* 649 P.2d 972, 975–76 (Alaska App.

---

**2.** The court cited ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press § 8–3.5(c) (2d ed. Approved Draft 1978):
 Whenever there is a substantial likelihood that, due to substantial publicity, the regularly allotted number of peremptory challenges is inadequate, the court shall permit additional challenges to the extent necessary for the impaneling of an impartial jury.

**3.** Alaska Rule of Criminal Procedure 24(d) allows the defendant ten peremptory challenges in a felony case. The prosecutor is allowed six.

1982), *citing Troyer v. State*, 614 P.2d 313 (Alaska 1980). The burden is on the state to prove by a preponderance of the evidence that a confession was voluntary. *Sovalik v. State*, 612 P.2d 1003, 1006 (Alaska 1980).

In *Stobaugh v. State*, the supreme court held: "the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement was such as to overbear [the defendant's] will to resist and bring about confessions not freely self determined." 614 P.2d 767, 772 (Alaska 1980), *citing United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir.1967), *cert. denied*, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967). In evaluating the totality of the circumstances to determine whether a confession was voluntary, the court may consider the age and mentality of the defendant, the frequency of interrogation, and the existence of threat or inducement. *See Sprague v. State*, 590 P.2d 410, 414 (Alaska 1979).

Although Chase concedes that he received the requisite *Miranda* warnings, he claims that the circumstances surrounding the confession show that it was involuntary. He argues that his statement should have been suppressed because: (1) the initial *Miranda* warnings were equivocal; (2) the police deceived him into believing he was not a suspect; (3) he was misled by a pretense of sympathy exhibited by Investigator Miller; (4) the *Miranda* warnings were not repeated at the beginning of the hospital interview; (5) he was misled by an implied promise by Investigator Miller that the untaped part of the interrogation would not be used against him; and (6) he was led to believe that he would not be charged with Klinkhart's death by assurances that he would not be charged with sex or drug offenses related to the case. In addition, he argues that he was particularly vulnerable to these alleged police practices because he was only eighteen-years-old and had never been arrested as an adult.

Judge Ripley made specific findings of fact contrary to Chase's contentions. Judge Ripley found, based on Investigator Miller's statements at the beginning of the first taped interview, that the initial *Miranda* warnings were not equivocal and that Chase was not misled about his status as a suspect. Before the initial reading of the *Miranda* rights, Investigator Miller asked Chase if he knew what crime was being investigated. Chase replied that it was Klinkhart's death. Just before Chase was advised of his *Miranda* rights, the following conversation took place between Miller and Chase:

M: And I want you to keep in mind that ... that we're dealing with the last people that were at the party; the last people to leave, and there's kind of a ... there's kind of a rule in things like this when we get down to the last people that ... that were around a crime scene, that for their protection we advise them of their rights. And that's what I'd like to do with you, Al. I'd like to advise you of your rights, so that there's no problem further on down the line. I want you to know what your constitutional rights are under *Miranda*, okay. Ah, and as I say, it's for your protection, because what I ... what I would like to do later on in the interview is go back through you ... go back through your evening with you, okay?

C: Um'hum.

M: Like I say, ah, the fellows that talked to you before were just kind of contacting everybody that was ... had been there and get a little idea of what went on, okay? ... I think I have a form here that I'll read ... to Al off of; but again, I want you to understand this is ... for your benefit ... so that you do know these things, okay? And, I have in front of me the standard State Trooper form for advisement of your rights. Now I'm filling out the top part of it.

C: Is this going to take longer than about four o'clock?

M: I ... I don't think so. Well, we'll get rolling here, okay. But, like I say, ... I know you're anxious to get ... you were at work weren't you?

C: Yeah.

M: Okay. I know you're anxious to get back. So, let me do this and I'll have you read it yourself. We'll sign it and ... then I'll talk to you, okay?

Investigator Miller then read aloud each of the *Miranda* rights, and gave Chase time to read them himself. Chase read the form, signed it, and initialed each line.

 Judge Ripley found that the defendant was fully informed of his rights and that he signed the waiver with adequate knowledge of the consequences. His conclusion is not clearly erroneous. Although Miller's statements may have indicated that Chase was not a suspect, Miller thoroughly went over each of the rights with Chase. Nothing in the record indicates that Chase did not understand his rights, or that any pressure was put on him to waive them.

 Judge Ripley also rejected Chase's contention that Investigator Miller misled him into believing that his statements would not result in charges being filed against him. Judge Ripley found that Investigator Miller made it clear to Chase that he was only telling him he would not be charged with any drug or statutory rape offenses. A review of the record shows that it was the defendant who brought up the question of whether his statements would lead to charges for statutory rape. Investigator Miller responded that he was investigating Klinkhart's murder, and it was all right if Chase and Klinkhart had had sexual contact. The investigator's answer that no charges would be filed was clearly limited to statutory rape. The discussion about drugs apparently did not take place until after Chase had admitted killing Klinkhart, so it cannot be said to have influenced his decision to make statements about the murder. Judge Ripley's findings that these statements did not mislead Chase are supported by the record and are not clearly erroneous.

 We have independently reviewed the record and conclude that Chase's statement was voluntary. Judge Ripley noted that Chase was only eighteen-years-old and was not very assertive. However, Judge Ripley also noted that during the early part of the interrogation Chase carefully chose the factual responses that he made and stuck to his original story until he was confronted with the evidence of the bite mark. Judge Ripley pointed out that throughout the interrogation, even after he admitted the murder, Chase volunteered information beyond that asked of him. Chase was not questioned continually or even held in one place. Most of the questioning occurred at the hospital, and that is where Chase made his major admissions. Judge Ripley concluded that the interrogation tactics employed by Investigator Miller did not "overbear [the defendant's] will."

 The fact that Chase might not have realized that he was a prime suspect does not lead us to conclude that the conduct of Investigator Miller was such as to overbear Chase's will. In comparison, the court in *Sovalik v. State*, 612 P.2d 1003, 1007 (Alaska 1980), refused to suppress a confession where the police used the opposite tactic. In *Sovalik*, a police officer falsely told the defendant that he had a fingerprint which linked him to the crime. After being confronted with this "evidence," Sovalik confessed. This tactic seems much more coercive than not informing the defendant of the fact that he is a prime suspect.

 Finally, the fact that Investigator Miller was friendly and sympathetic or that he made the statement to the defendant that the untaped interrogation would be "just between the two of them" does not make the statement involuntary. Judge Ripley found that Chase's statement was given voluntarily and with full knowledge of the consequences. After independently reviewing the record, we agree. Chase had been given *Miranda* warnings earlier, and

had been confronted with the evidence against him. He then made the admissions to Officer Miller. He repeated these admissions on tape after again being warned of his rights. It appears that Chase was not misled about the fact that his incriminating statement could be used against him. We accordingly hold that Chase's statement was voluntary and that Judge Ripley did not err when he refused to suppress the statement. *See Harris v. State*, 678 P.2d 397, 405 (Alaska App.1984).

The conviction is AFFIRMED.

SINGLETON, Judge, concurring and dissenting.

I agree with the court's disposition of all of the issues except Chase's motion for change of venue. While I agree that Judge Ripley was not obligated to change venue in this case prior to conducting the *voir dire* examination, I am satisfied from reading the transcript of the *voir dire* that venue should have been changed at that time. I am left with the firm conviction that the overwhelming majority of those included within the jury panel had seen Chase tried and convicted in the newspapers. While their memories of the news reports and the specific details contained therein may have been sketchy, there is no doubt that these potential jurors were aware of the tremendous community hostility towards Chase and the general belief that he was guilty. Under these circumstances, I believe it was an abuse of discretion not to transfer this case to some other district so that if Chase were convicted we could be confident that his conviction rested on the evidence presented in court and not on the impressions jurors brought into court with them.