**Geoffrey MATHIS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**Donna MATHIS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**Nos. A–2325, A–2326.**

Court of Appeals of Alaska.

Aug. 11, 1989.

Rehearing Denied Sept. 19, 1989.

---

Robert M. Beconovich, Fairbanks, for appellant Geoffrey Mathis.

Dick L. Madson, Law Offices of Dick L. Madson, Fairbanks, for appellant Donna Mathis.

W.H. Hawley, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

SINGLETON, Judge.

Geoffrey and Donna Mathis were each convicted of one count of murder in the first degree, AS 11.41.100(a); one count of kidnapping, AS 11.41.300(a); one count of robbery in the first degree, AS 11.41.-500(a)(1); one count of murder in the second degree, AS 11.41.110(a)(3); and two counts of misconduct involving a controlled substance in the third degree, AS 11.71.-030(a)(1). Judge Jay Hodges sentenced the Mathises to ninety-nine years each for both the first-degree murder convictions and the kidnapping convictions, and to four years each for each count of the misconduct involving a controlled substance convictions. He also sentenced Mr. Mathis to ten years for the first-degree robbery conviction, and Mrs. Mathis to seven years for the first-degree robbery conviction. No sentences were imposed for the second-degree murder convictions, which were deemed to have merged into the first-degree murder convictions. All sentences were made concurrent with each other, thus leaving each of the Mathises subject to a composite sentence of ninety-nine years' incarceration. The Mathises appeal, challenging their convictions and sentences.

The Mathises' charges arose from the drug-related shooting of Mark Miner in Fairbanks in late November or early December of 1986. At the time, the Mathises were involved in an ongoing large scale cocaine distribution scheme with Clyde A. Denbo. The Mathises were in charge of the enterprise. Mark Miner had become heavily indebted to the Mathises as a result of a series of cocaine transactions. The Mathises believed Miner had become or was likely to become a police informant. They were also fearful that if they dealt leniently with Miner, others would be encouraged not to pay their debts. They therefore decided to kill Miner. At the direction of the Mathises, Denbo located Miner, who was apparently attempting to hide from the Mathises. Denbo persuaded Miner to accompany him, purportedly to distribute a newly arrived shipment of cocaine. Denbo and the Mathises subsequently disarmed Miner at gunpoint and took approximately $250 in cash from him. Geoffrey Mathis, accompanied by Donna Mathis, Denbo, and another individual, then drove Miner to a remote location outside of Fairbanks where Denbo killed Miner by firing three shots in the back of his head. *See Denbo v. State*, 756 P.2d 916, 917 (Alaska App.1988).

Together, the Mathises raise four issues on appeal: (1) whether the evidence used to support a search warrant for storage locker H–20 at Sophie's Plaza was obtained illegally, and the resulting evidence should be suppressed; (2) whether the trial court erred in refusing to sever the counts of the indictment alleging cocaine possession from those alleging kidnapping, robbery, and murder; (3) whether the trial court properly allowed Sandy Yarbrough to testify that Mrs. Mathis had sold cocaine to

her on a prior occasion; and (4) whether the sentences imposed were excessive.[1]

The Mathises first argue that the evidence used to support the search warrant for storage locker H–20 at Sophie's Plaza was obtained illegally and that all evidence resulting from the search should therefore have been suppressed. On the day of the arrest, Mr. Mathis was carrying a ring of keys, and Mrs. Mathis had a single key in her pocket. Mrs. Mathis' key and one of Mr. Mathis' keys went to a Master brand padlock. The number 2557 was printed on both keys. Later that day, at approximately 9:15 p.m., Troopers Paul E. Bartlett and William Gause (of the Metropolitan Drug Unit) took the keys to Sophie's Plaza and attempted to match them to a locker. The officers went to building "L" which was open at the time. The officers tried the keys in all of the Master brand padlocks, but did not find a match.

When the officers left building "L," they met a man in a white van with a Sophie's Plaza sign on the side. The officers told the man they were with the police, and also told him what they were doing. The man directed the officers to a second storage area, building "H." The door to building "H" was open. Trooper Bartlett found his key fit locker H–20. The Master lock on locker H–20 also had the number 2557, the same as the two keys.

Bartlett entered the room and turned on a light in the center of the room. He saw two safes, a gun case, and various other items. Bartlett opened the gun case and saw what looked like an automatic weapon and some handguns. The officers returned to the station and reported their findings to Sergeant Edwin Close. Sergeant Close dispatched Sergeant Gregory Tanner to guard the locker. Tanner parked outside building "H." During his watch, a man arrived in a white van with a "Sophie's Station" sign on the side. The man was wearing a shirt with "Sophie's Station Security" written on it. He asked what Tanner was doing, and told Tanner that he had spoken with the troopers earlier that evening.

On March 6, 1987, the state applied for a search warrant to District Court Judge Christopher E. Zimmerman. Judge Zimmerman was presented evidence that the police had successfully arranged a drug buy, that Denbo had picked up the Mathises, drove to Sophie's Plaza, and then sold drugs to Mike Moritz, who was working undercover for the police. Judge Zimmerman was also presented evidence of the keys taken from the Mathises. Trooper Bartlett testified that the number on the Master padlock on locker H–20 corresponded to the numbers on the keys. He also testified that he put the key in the lock, that the key opened the lock, and that he looked in the room.

1. Individually, Donna Mathis raises two additional issues: (1) whether the trial court erred in failing to dismiss the indictment against her; and (2) whether the trial court erred in denying her motion for judgment of acquittal. We have carefully reviewed the evidence presented to the grand jury and conclude that the trial court did not err in declining to dismiss the indictment. We are satisfied that the evidence presented to the grand jury provided a sufficiently detailed account of criminal activity and that Donna Mathis participated in this criminal activity. This evidence, if unexplained or uncontradicted, would warrant Donna Mathis' conviction for the offenses. See Lupro v. State, 603 P.2d 468, 473 (Alaska 1979) (quoting Newsom v. State, 533 P.2d 904, 906 (Alaska 1975)). We are also satisfied that the evidence presented against Donna Mathis at trial was sufficient to sustain a conviction and that the trial court did not err in denying the motion for judgment of acquittal. Viewing the evidence and the inferences there-

from in the light most favorable to the state, we find that reasonable minds could conclude that Donna Mathis' guilt had been established beyond a reasonable doubt. See Des Jardins v. State, 551 P.2d 181, 184–85 (Alaska 1976). In this regard, we are satisfied that the testimony of the accomplices was sufficiently corroborated to induce in the jurors' minds "a rational belief that the accomplice[s] [were] speaking the truth when [they] implicated [Donna Mathis] in the criminal event." See Brown v. State, 693 P.2d 324, 329 (Alaska App.1984) (citations omitted). We believe that the evidence interpreted most favorably to the state establishes that Donna Mathis was more than a passive participant or an accessory after the fact. Instead, the evidence establishes that she actively participated in the plan to kill Miner, and that her motive was the protection of the cocaine business in which she was an active participant. We are satisfied that there was substantial evidence beyond the testimony of her accomplices.

Judge Zimmerman was informed that the probable cause was based on things other than what the trooper saw in the room, but that the state wanted to inform the judge that the trooper had looked into the room. Sergeant McCann also informed the judge that other warrants issued in the case had discovered guns and a small amount of marijuana, but no other drugs. He testified that Moritz told the police that the Mathises did not store drugs in their home. Sergeant McCann therefore expected drugs to be found in locker H–20 at Sophie's Plaza. Judge Zimmerman issued the warrant.

In ruling on the Mathises' motion to dismiss, Judge Hodges found "the officers were not trespassers when they entered building 20. Either because the door was open and/or they had permission of someone from Sophie's Plaza." Judge Hodges found that probable cause was established prior to the troopers' entry into the locker and that the information presented to Judge Zimmerman concerning events prior to the entry in the locker was acceptable. Judge Hodges found that the warrant was valid and that none of the evidence should be suppressed. Judge Hodges also allowed into evidence items seized from a safe in the locker, even though no separate warrant was obtained for the safe. Judge Hodges reasoned that the warrant to search the locker encompassed a warrant to search any safes found within the locker because the evidence covered by the search warrant could have been located in a safe. Judge Hodges found this tantamount to searching a locked closet or drawer in a residence where there is a valid warrant for the residence. We are satisfied that Judge Hodges was not clearly erroneous in reaching the conclusions he did.

■ The first question is whether the officers had authority to enter building "H." We find that, for two reasons, the officers properly entered the building. First, it is generally accepted that the unlocked common hallways of multi-unit buildings are open to the public. *See Ingram v. State,* 703 P.2d 415, 427 n. 11 (Alaska App.1985), *aff'd,* 719 P.2d 265

(Alaska 1986). We believe that the same rule should apply to the storage areas at Sophie's Plaza. The storage leases provided that the storage buildings were to remain open for business until 10:00 p.m. each night. The entry into the hallway occurred in this case before 10:00 p.m. Furthermore, this commercial storage building was apparently open to the general public. This would distinguish it from a storage shed enclosed within the curtilage of the defendant's residence. *See Ingram,* 703 P.2d at 426–27 & n. 11. *See also Commonwealth v. Johnston,* 530 A.2d 74, 80–81 (Pa.1987) (police observed a man removing marijuana from a storage facility and used a dog to detect the appropriate locker; search warrant upheld). We also find the officers properly entered building "H" because the officers received permission from a security officer. The security officer had the apparent authority to grant permission to be in the hallway of the storage area. The employee was driving a "Sophie's Station" van, and wearing a shirt with "Sophie's Station Security" written on it. Under the circumstances, the officers had permission to be in the building. *See Hubert v. State,* 638 P.2d 677, 684 (Alaska App.1981).

■ Assuming that the officers were properly in the hallway, the second question is whether inserting the key into the padlock was an improper search. The cases are in conflict. On balance, we conclude that inserting the key, without actually opening the door, did not constitute an illegal search. *See United States v. DeBardeleben,* 740 F.2d 440, 443–45 (6th Cir.), *cert. denied,* 469 U.S. 1028, 105 S.Ct. 448, 83 L.Ed.2d 373 (1984). In our view, insertion of the key, without opening the door to look into the room, is a "minimal intrusion, justified by founded suspicion and in furtherance of the legitimate interests of crime investigation...." *Id.* at 445 (citations omitted). Insertion of the key did not constitute a search of the locker, but merely an identification of it as belonging to the Mathises. *See also State v. Dunlap,* 392 So.2d 1366, 1368 (Fla.App.1981) (inserting key in trunk of Pontiac was not unlawful search); *People v. Trull,* 64 Ill.App.3d 385,

20 Ill.Dec. 960, 961–62, 380 N.E.2d 1169, 1171–72 (Ill.App.1978) (inserting and turning of key in apartment door when officers are someplace where they have a right to be is not a search). We also note that prior to inserting the key in the lock, the officers matched the number on the keys to the number on the Master lock. The numbers on the lock were exposed to public view. There was no expectation of privacy in the numbers on the lock.

■ The Mathises' final contention with regard to this issue is that even if the officers were properly in the hall and even if they properly used the key to identify the Mathises' locker, their observations after illegally opening the locker were critical to the issuance of the warrant. The Mathises rely on the recent Supreme Court decision in *Murray v. United States,* — U.S. ——, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). In *Murray,* the Supreme Court said:

> The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

*Id.* at 2535–36 (footnote omitted).

In this case, the magistrate was told of the illegal entry, as required by *Cruse v. State,* 584 P.2d 1141, 1146 (Alaska 1978). However, he was not informed of any observations made during the illegal search. Consequently, the trial court did not err in concluding that the illegal entry into the locker did not influence the magistrate. It is clear that the officers had probable cause before looking in the locker. A "drug buy" had been arranged. Denbo was observed going to Sophie's Plaza with the Mathises and then to meet Moritz. At that meeting, Denbo sold Moritz cocaine. The magistrate had been informed that the Mathises did not keep cocaine at their home. The magistrate was also informed of the keys, the corresponding numbers on the Master lock, and the fact that the keys fit the lock. The magistrate was not told what the officers saw in the locker. Thus, the only question left under *Murray* is whether the officers would have sought the warrant even if they had not entered the locker. Because the police had already served warrants on the Mathises' residence and on their trailer without finding cocaine, and because the police believed that the Mathises had cocaine, the officers went to find the locker at Sophie's Plaza. It is apparent the officers would have sought the warrant even without looking in the locker.

We therefore conclude that, viewing the evidence in the light most favorable to the state, *Ahkivgak v. State,* 730 P.2d 168, 171 (Alaska App.1986), the court did not abuse its discretion in issuing the warrant. *State v. Bianchi,* 761 P.2d 127, 129–30 (Alaska App.1988). Judge Hodges therefore did not commit error in approving the search and admitting the resulting evidence.

■ The Mathises next argue that under Alaska Criminal Rule 14, the trial court erred in refusing to sever the counts of the indictment dealing with the misconduct involving a controlled substance in the third degree from those counts dealing with murder, kidnapping, and robbery. The issue is somewhat muddled as the Mathises have mixed arguments under Criminal Rule 8(a) and (b) that there was improper joinder. The state seems to be correct in its assertion that Rule 8(a) has no bearing on situations where multiple counts involve multiple defendants. Whenever there is more than one defendant, the joinder of both defendants and issues is governed by Rule 8(b). *See Amidon v. State,* 565 P.2d 1248, 1257 (Alaska 1977); Wright, *Federal Practice and Procedure: Criminal* § 144 at 494 (2d ed. 1982) ("It is firmly established in the case law that the propriety of joinder in cases where there are multiple defendants must be tested by Rule 8(b) alone and that Rule 8(a) has no application."). Thus, the issue for joinder under Rule 8(b) is whether the cocaine charges

and the murder, kidnapping, and robbery charges arose from "the same series of acts or transactions constituting an offense or offenses." *Greiner v. State*, 741 P.2d 662, 664 (Alaska App.1987). While the issue is close, we believe that the requirements of Criminal Rule 8(b) were met and that joinder was proper under this rule.

■ The state's theory of the murder, kidnapping, and robbery offenses was that the Mathises, through their agent Denbo, committed the murder and carried out the kidnapping and robbery in defense of their cocaine distribution business. It is important to stress that the state's theory was that the Mathises conducted a substantial distribution business, and not that they participated in merely a few isolated transactions. There is certainly an identity of participants between the various cases because the Mathises, Denbo, and Moritz were all involved in one way or the other in each of the offenses, and many of the facts and pieces of proof are similar. The plan to sell cocaine between the Mathises, Denbo, Moritz, Brad Graber, and Miner could be introduced to strengthen the state's evidence of motive for Miner's murder.

A conclusion that the requirements of Rule 8(b) were satisfied does not dispose of the issue, however. The Mathises made a timely motion to sever under Criminal Rule 14. Rule 14 presupposes proper joinder, but seeks severance based upon prejudice.[2] We are satisfied that the extensive evidence regarding cocaine possession and the contents of the locker at Sophie's Plaza could properly be admitted against the Mathises to show the extent of their cocaine distribution business and to corroborate their accomplices' testimony regarding their motive for Miner's murder. The problem in this case is turning the question around to determine how much of the murder, kidnapping, and robbery evidence would be admissible on the cocaine charges. The state argues that the cocaine sale to Moritz was an effort to buy his silence. This argument is tenuous. There

was no evidence introduced at trial that the drug sale was used to buy Moritz's silence. Furthermore, as the Mathises argue, any evidence of this motive is severely undermined because Moritz was the first to contact Denbo and the Mathises about obtaining cocaine. Perfect cross-admissibility of evidence is not required under Criminal Rule 8(b) as long as "the counts ... are logically interrelated and involve overlapping proof." *See United States v. Swift*, 809 F.2d 320, 322 (6th Cir.1987). However, in this case, there is a risk that the Mathises' defense on the cocaine charges was severely prejudiced by the evidence of murder.

In summary, it appears that the evidence of cocaine possession and sale would have been admissible on the murder, kidnapping, and robbery charges, but that the murder, robbery, and kidnapping evidence would not have been admissible on the cocaine charges. On balance, we believe that the appropriate action to take is to vacate the cocaine convictions, but affirm the murder convictions. *See Elerson v. State*, 732 P.2d 192, 195 (Alaska App.1987).

In reaching this conclusion, we note that the Mathises have a heavy and difficult burden of showing undue prejudice. *See United States v. Pilling*, 721 F.2d 286, 297 (10th Cir.1983). Furthermore, to help cure any prejudice, courts have noted that when the evidence is "not complicated or confusing," *United States v. King*, 803 F.2d 387, 391 (8th Cir.1986), there is little risk of jury confusion and courts have affirmed the refusal to sever. We also note that "courts have long recognized that cautionary instructions do allow juries to separate evidence relating to different charges respecting different defendants." *Larson v. State*, 566 P.2d 1019, 1022 (Alaska 1977). As the state points out, the court gave the jury a limiting instruction.

Finally, the evidence against the Mathises regarding the cocaine transactions was very strong, making a harmless error de-

---

**2.** The state argues that the Mathises waived objections based upon Rule 14 by not renewing their motion at trial. We have carefully reviewed the record and conclude that the trial court clearly and unequivocally ruled on the issue prior to trial, and that under the circumstances, a further motion would have been futile. Consequently, we find no waiver.

termination a difficult question. We are nevertheless persuaded to reverse the cocaine convictions because we are satisfied that there is a substantial risk that the jurors, convinced that the Mathises had murdered Miner in defense of their cocaine business, would rush to judgment on the cocaine possession and sale charges without giving those charges the careful consideration that the law and the limiting instruction required.

■ The Mathises next argue that the trial court erred in permitting Sandy Yarbrough to testify that she purchased cocaine from Mrs. Mathis on unrelated occasions. The Mathises argue that this evidence was irrelevant to the charges pending against them and simply established their propensity to sell cocaine, in violation of Alaska Evidence Rule 404(b).

In analyzing the problem under Evidence Rule 404(b), there is a presumption that the prejudicial effect of propensity evidence outweighs its probative value. "When, however, a prior bad act is relevant to a material fact other than propensity, the court may admit the evidence if an Evidence Rule 403 balancing shows the evidence to be more probative than prejudicial." *Lerchenstein v. State*, 697 P.2d 312, 315 (Alaska App.1985) (footnote omitted), *aff'd*, 726 P.2d 546 (Alaska 1986). Thus, the court must first determine if there is "relevancy apart from propensity;" if so, the court must weigh the non-propensity relevance against the prejudicial impact. *Id.* at 315–16.

Yarbrough's testimony tended to show that Mrs. Mathis was directly involved in the cocaine distribution business. Viewed in light of the other evidence, it bolstered the state's theory that Mrs. Mathis had a motive similar to her husband's for wishing Miner dead. There was already evidence from Denbo, Moritz, and Graber that Miner had accumulated a large cocaine debt to Denbo and the Mathises. Miner's debt and the Mathises' fear that he would go to the police were the alleged motives for the murder. Under the circumstances, given the substantial evidence of cocaine involvement, any error in admitting Yarbrough's testimony would have been harmless beyond a reasonable doubt.[3] *Love v. State*, 457 P.2d 622, 631 (Alaska 1969).

In *Stevens v. State*, 748 P.2d 771, 775 (Alaska App.1988), this court noted that overwhelming evidence of guilt can overcome prejudicial testimony. In this case, Yarbrough's testimony was a small part of the trial. There was also evidence from Denbo, Moritz, and Graber. Both Mr. and Mrs. Mathis had keys to locker H–20 when arrested. Mr. Mathis' fingerprints were on one of the cocaine bags found in locker H–20. There was also a triple beam scale in their home and Mr. Mathis had a beeper when he was arrested. All of this evidence was properly admitted to show the extent of the Mathises' involvement in an ongoing cocaine distribution enterprise, thus bolstering the state's evidence of motive for Miner's murder. Therefore, if Yarbrough's testimony was prejudicial, it was clearly harmless.

■ The Mathises' final contention is that their sentences are excessive. Goeffrey Mathis argues that he was a youthful first felony offender with no prior criminal convictions and good prospects for rehabilitation. He also points out that the other participants, except Mrs. Mathis, received lighter sentences because they cooperated with the state. *See, e.g., Denbo*, 756 P.2d at 917–18. Mrs. Mathis argues that her participation in the murder, kidnapping, and robbery was minor as compared to the other participants and that the trial court failed to give her sentence individual consideration and to properly weigh her potential for rehabilitation.

The record does not support the Mathises' contentions. Judge Hodges looked to their youthfulness, their lack of prior records, and their potential for rehabilitation; his consideration of these factors was part of the reason he gave concurrent sentences. The court directly addressed Mrs.

**3.** Yarbrough's testimony was also relevant in this case on the cocaine charges. Our decision to reverse the cocaine convictions, however, makes it unnecessary for us to consider this issue further.

Mathis and found that, while her participation may not have been as great as Mr. Mathis', she was involved and participated in the overall criminal venture and that it was something she desired. The record bears this out. We have reviewed the tapes of the discussions Moritz, Denbo, and the Mathises had regarding the murder, which were recorded by Moritz and the police. Although the conversations are difficult to hear, the tapes at least corroborate that all participated in Miner's murder and acknowledged their guilt. They also show a complete absence of remorse by the Mathises, who seem to gloat over the killing.

We have consistently approved maximum terms for first offenders convicted of first-degree murder under comparable circumstances. *See, e.g., Ridgely v. State,* 739 P.2d 1299, 1302 (Alaska App.1987); *Lewis v. State,* 731 P.2d 68, 72–73 (Alaska App. 1987); *Riley v. State,* 720 P.2d 951, 952–53 (Alaska App.1986); *Hoover v. State,* 641 P.2d 1263, 1264 (Alaska App.1982). Having independently reviewed the entire sentencing record, we cannot say that the sentences imposed on Donna and Geoffrey Mathis were clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

Donna and Geoffrey Mathis' convictions for murder in the first degree, kidnapping, and robbery in the first degree, and the resulting sentences are AFFIRMED. Their convictions and sentences for two counts of misconduct involving a controlled substance in the third degree are REVERSED.