Chris N. NELSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–1697.

Court of Appeals of Alaska.

Nov. 3, 1989.

Susan Orlansky, Asst. Public Defender and John B. Salemi, Public Defender, Anchorage, for appellant.

Robert D. Bacon, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Chris N. Nelson was convicted, following a jury trial, of sexual assault in the first degree and kidnapping. AS 11.41.410 and AS 11.41.300(a)(1)(C). Nelson appeals his conviction and we reverse.

On November 17, 1985, Nelson was charged with the sexual assault and kidnapping of N.F. in Seward, Alaska. Nelson's major contention on appeal is that he was denied his right to an impartial jury. Nelson argues that Superior Court Judge Charles K. Cranston abused his discretion during jury selection by denying his motions for change of venue, denying his request for additional peremptory challenges, and denying his challenge for cause of juror Steve Lemme.

Jury selection started in May 1986. The parties questioned fifty-seven prospective jurors. Judge Cranston excused twenty-seven jurors for cause. Of the jurors whom Judge Cranston excused for cause, ten knew N.F. well or at least knew her as more than a mere acquaintance. Judge Cranston excused two other jurors on the panel because they knew the Nelson family. Judge Cranston excused another juror who was a nurse on duty at the hospital on the night that N.F. came in for the rape examination following the sexual assault.

The court excused one other juror because he said he was unable to disregard an article which he had read in a newspaper, the *Phoenix Log*, concerning the assault on N.F. That article stated that Nelson had been arrested and charged with sexual assault in the first degree based upon N.F.'s positive identification of him from a photo lineup. The article indicated that Nelson had prior felony convictions for three counts of sexual assault in the first degree and a burglary conviction. It reported that, based upon these convictions, Nelson served three years in prison and had been released approximately one month before the most recent sexual assault charge and was on probation. The article also reported that, earlier in the month, the police had charged Nelson with the misdemeanor offense of furnishing liquor to a minor. According to the article, Nelson was imprisoned on $100,000 bail.

The court excused several other jurors for various reasons; some had problems regarding transportation, some knew several witnesses, and others were especially sensitive to the issue of sexual assault. Nelson exercised all of his peremptory challenges, his ten statutory challenges and one additional challenge for an alternate juror. All the jurors whom Nelson peremptorily challenged were acquainted with at least one of the state's witnesses and six of them stated that they had seen the article in the *Phoenix Log*. After Nelson had exercised nine of his peremptory challenges, he asked the court for three additional peremptory challenges. Judge Cranston denied this motion but did excuse one juror for cause, *sua sponte*. Nelson then moved for a change of venue. Judge Cranston denied this request as well.

After Nelson had used all ten of his peremptory challenges, the next prospective juror was Lemme, who ultimately served as juror number 12. Lemme stated that he had known N.F. and her husband for approximately two years. He had worked with N.F.'s husband and had been invited to their home, although he had never been able to accept the invitations. Lemme stated that he was not close friends with the F.'s although he respected them as a family. He indicated that, if he returned a verdict not guilty and later saw the F.'s again, it would be natural for him to feel a little uncomfortable. He admitted that it would be hard for him not to think about his relationship with the F.'s but that he considered himself to be a fair person and that he did not believe it would affect his deliberations as a juror. Out of the presence of the other jurors, Lemme said that he had seen the article in the *Phoenix Log*. He was familiar with some of the details of the sexual assault as reported in the paper. Lemme remembered that the article reported where the victim of the rape worked and that he and his wife had assumed that the victim might be N.F. He stated he had not talked to the F.'s about the matter because it was too personal. He said he believed that he could disregard everything that he read in the article.

Nelson asked Judge Cranston to grant him additional peremptory challenges or to excuse Lemme. Judge Cranston denied both requests. Judge Cranston found that, based on the overall tone of his answers, Lemme could be a fair and impartial juror. After jury selection was complete, Nelson again moved for a change of venue. Nine of the seated jurors knew at least one of the state's witnesses and five remembered seeing the article in the *Phoenix Log*. Judge Cranston denied this second motion for a change of venue.

The federal and state constitutions guarantee a criminal defendant the right to an impartial jury. U.S. Const., Amend. 6; Alaska Const. art. 1, § 11. Alaska Statute 22.15.080(1) provides that the court shall

grant a change of venue where "there is reason to believe that an impartial trial cannot be had." Nelson contends that Judge Cranston abused his discretion during the jury selection when he denied Nelson's motions for a change of venue, denied Nelson's requests for additional peremptory challenges, and denied Nelson's challenge for cause of juror Lemme. We conclude that there is a substantial doubt whether Nelson was tried by an impartial jury. We accordingly reverse Nelson's conviction.

The *voir dire* shows that this was a case where it was particularly difficult to select an impartial jury. The parties questioned fifty-seven prospective jurors. The court excused twenty-seven of these for cause. Of the challenges for cause which the court granted, all appear to have been for substantial reasons where the jurors' impartiality was in question. One major cause for concern, which the jury *voir dire* revealed, was that a number of jurors were familiar with the state's witnesses. This was not unusual for a small town, but it was a factor which made selection of an impartial jury difficult. Another factor was the pretrial publicity in the *Phoenix Log*. In *Mallott v. State*, 608 P.2d 737, 749 (Alaska 1980), the supreme court adopted the recommendation of the American Bar Association that "[a] prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to the prospective juror's testimony as to state of mind." II *Standards for Criminal Justice*, § 8–3.5(b) (Approved Draft 1978). ABA Standard 8–3.5(c) provides: "Whenever there is a substantial likelihood that, due to pretrial publicity, the

regularly allotted number of peremptory challenges is inadequate, the court shall permit additional challenges to the extent necessary for the impaneling of an impartial jury."[1]

■ In considering pretrial publicity, the supreme court and this court have focused on the exposure of jurors to highly prejudicial information. *Mallott*, 608 P.2d at 749; *Oxereok v. State*, 611 P.2d 913, 919 (Alaska 1980); *Jerrel v. State*, 756 P.2d 301, 304 (Alaska App.1988); *Chase v. State*, 678 P.2d 1347, 1351 (Alaska App. 1984). The article in the *Phoenix Log* contained material which was highly prejudicial to Nelson. The article reported that Nelson had been convicted of burglary and three counts of sexual assault.[2] It indicated that Nelson had been imprisoned and recently released on probation. The article also stated that Nelson had been charged with a misdemeanor offense and that his bail on the present charge was $100,000. Five of the jurors who actually sat on the case remembered reading the article in the *Phoenix Log*. Although none of these jurors indicated that they remembered any of the prejudicial information, we find the exposure of the jurors to this article to be problematic. In *Mallott* the court stated that "the voir dire process is not an infallible Geiger counter of juror prejudice, and to rely excessively on its efficacy in uncovering 'actual prejudice' places an unrealistic burden on a defendant." *Mallott*, 608 P.2d at 748. It is difficult to question a juror about his or her exposure to prejudicial material without running the risk of further prejudicing the juror. A juror who has been exposed to inflammatory material, but indicates that he or she cannot remember this material, may find his or her memory refreshed during the course of the trial. In *Oxereok*, 611 P.2d at 919, the

---

1. The supreme court quoted this section of the ABA standard in *Mallott* at 608 P.2d 737, 749 n. 30.

2. The article was inaccurate in reporting that Nelson had been convicted of three counts of sexual assault; he had in fact been convicted on only a single count. The fact that Nelson had been convicted of burglary was introduced at

trial, and there has been no claim that the prior conviction was introduced improperly. We are therefore less concerned about the fact that the jurors were exposed to information that Nelson had been convicted of burglary than we are about the other information concerning Nelson's criminal history which was inadmissible.

supreme court pointed out that inflammatory pretrial publicity had the potential of creating prejudice "much of which might be unconscious but no less real."

We are not convinced that the court could not have selected an impartial jury in Seward. We do not believe that the court erred in refusing to change venue. However, given the number of jurors who were familiar with the witnesses in the case, and the exposure of several of the jurors to prejudicial pretrial information, the court needed to exercise extreme diligence to select an impartial jury. *See Mallott*, 608 P.2d at 749; *Jerrel*, 756 P.2d at 305; *Chase*, 678 P.2d at 1351. Given these problems, we conclude that the court was required to, at a minimum, either grant Nelson's challenge for cause of juror Lemme or grant Nelson additional peremptory challenges. Although Lemme ultimately stated that he could be fair, his answers on *voir dire* indicated that he was well acquainted with N.F. and her husband. On several occasions, he was equivocal as to whether he could fairly judge the case. In addition, Lemme had been exposed to the article in the *Phoenix Log*. His answers revealed that he was familiar with the details of the sexual assault which was reported in the paper. Again, "the voir dire process is not an infallible Geiger counter of juror prejudice, and to rely excessively on its efficacy in uncovering 'actual prejudice' places an unrealistic burden on a defendant." *Mallott*, 608 P.2d at 748. Given the substantial difficulties in impaneling an impartial jury under the circumstances which we have outlined, the court should either have granted Nelson's challenge for cause of Lemme or have permitted additional peremptory challenges as suggested in the ABA Standards. We conclude that there is a substantial doubt whether Nelson was tried by an impartial jury. We accordingly reverse his conviction.

Nelson raises one other issue which is necessary for us to decide. He contends that the trial court erred in refusing to suppress evidence which was seized from him at the jail following his arrest for the sexual assault.

Police Corporal Michael Chapman obtained an arrest warrant and arrested Nelson shortly after the sexual assault. Chapman took Nelson to the Seward jail. At the jail David Thompson, a correctional officer, strip searched Nelson. Nelson's clothes were folded and placed on a chair. Following the search, Thompson gave Nelson a jumpsuit to wear. Chapman then transported Nelson to the hospital for a medical examination. Thompson completed the booking procedures when Nelson returned from the hospital. Chapman directed Thompson to place Nelson's clothes in the police evidence locker rather than follow the standard booking procedure, which would have been to place the prisoner's clothes in a prison locker for safe keeping. Chapman filled out an SD–10 form which was a standard police form which records items that have been seized as evidence.

Thompson made an inventory of the articles of Nelson's clothing during the booking procedure. Nelson signed the inventory record. Thompson testified that it was standard procedure to have an inmate sign the inventory even when items had been placed in the evidence locker.

The police sent Nelson's clothes to the FBI for examination. The analysis by the FBI revealed two of N.F.'s pubic hairs adhering to Nelson's undershorts. This evidence was introduced against Nelson at trial.

Nelson moved to suppress the evidence which was obtained from the police seizure of his clothing. Nelson argued that when he was booked into the jail, his clothing was seized as part of the inventory procedure. The state contends, and Judge Cranston found, that Chapman seized Nelson's clothing during a search incident to an arrest. The parties to this appeal agree that, if Chapman seized Nelson's clothes as a search incident to an arrest, then it was not necessary for him to obtain a search warrant to seize the items. The parties also agree that if the clothing was not seized as a proper search incident to an arrest, but was instead seized as a preincarceration

inventory search, then the police needed a warrant to seize Nelson's clothing. *Reeves v. State,* 599 P.2d 727, 736 (Alaska 1979).

■■■ The parties are correct in their agreement as to the law governing this case. *Marks v. State,* 496 P.2d 66, 67–68 (Alaska 1972) (appellate court independently must find that concessions are well-founded). There are only two valid justifications for a preincarceration inventory search. The first is to prohibit the introduction of weapons and other contraband into the jail. *Reeves,* 599 P.2d at 735. The second is to protect the inmate's property and to protect the jail against claims of loss or damage. *Id.* During the inventory search, correctional officials have no authority to conduct a general exploratory and investigatory search. The search is limited only to the noninvestigative. *Id.* at 736 n. 24. Therefore, if the search of Nelson's clothing was solely a preincarceration inventory search, then the seizure by the police of Nelson's clothing without a warrant was improper, and the evidence obtained from the examination of Nelson's clothing would have to be suppressed.

■ If, however, the seizure of Nelson's clothing was a valid search incident to an arrest, then the seizure and examination of Nelson's clothing was lawful. During a search incident to arrest, the officer may search the arrestee for "weapons which might be used to harm the officer and for evidence of the crime for which the person has been arrested." *Id.* at 732 n. 11, quoting Feldman, *Search and Seizure in Alaska: A Comprehensive Review,* 7 UCLA-Alaska L.Rev. 75, 97–98 (1977) (citations omitted).

The supreme court set out the requirements for a valid search incident to an arrest in *McCoy v. State,* 491 P.2d 127, 138 (Alaska 1971). The court restated those requirements in *Zehrung v. State,* 569 P.2d 189, 196 (Alaska 1977), *mod. on reh'g,* 573 P.2d 858 (Alaska 1978) (footnote omitted):

(1) The arrest must be valid—probable cause for the arrest must exist or the search is unconstitutional.

(2) The search must be roughly contemporaneous with the arrest....

(3) The arrest must not be a pretext for the search; a search incident to a sham arrest is not valid....

(4) Finally, the arrest must be for a crime, evidence of which could be concealed on a person.

Nelson does not dispute the fact that his arrest was valid. As to the second requirement, that the search be roughly contemporaneous with the arrest, "a search of an arrestee remains incident to an arrest when it is conducted thereafter at the jail or place of detention rather than at the time and place of arrest." *McCoy,* 491 P.2d at 131. The *Reeves* court suggested that a search incident to arrest could be conducted at the jail, even contemporaneously with the preincarceration search. *Reeves,* 599 P.2d at 732 n. 10. In *Lemon v. State,* 514 P.2d 1151, 1157–58 (Alaska 1973), the court stated that it was permissible to conduct a search incident to an arrest at the station house to allow a more thorough investigation and to spare the arrestee unnecessary public embarrassment.

Nelson argues that his case is similar to *Reeves* and *Lyle v. State,* 600 P.2d 1357 (Alaska 1979), cases where the supreme court found that the searches in question were preincarceration inventory searches. In *Reeves,* the police officer had arrested Reeves for driving while under the influence of intoxicating liquor. The officer conducted a breathalyzer examination at the police station and transported Reeves to the jail. After the officer left the jail, Reeves was searched by a correctional officer as part of the booking procedure. When the correctional officer found a balloon which appeared to contain drugs, he telephoned the police officer. The officer returned to the jail and examined the balloon. *Reeves,* 599 P.2d at 730. In *Lyle,* the arresting officer had turned Lyle, who had been arrested for operating a motor vehicle while under the influence of intoxicating liquor, over to the correctional officer for booking. The arresting officer had not left the facility at the time that the correctional officer found drugs on Lyle's person. However, the court concluded that "it is clear that the sole purpose of the

search was to inventory Lyle's possessions as part of the booking procedure and not to make a delayed search incident to his arrest." *Lyle*, 600 P.2d at 1358 n. 4.

██ In Nelson's case, Chapman was present when Nelson's clothes were removed and Chapman personally directed the correctional officer to place them in the evidence locker. Chapman filled out the standard form to show that he had seized the items as evidence. These actions were consistent with the procedures to be used during a search incident to an arrest. We believe that Judge Cranston could find, on these facts, that Chapman was conducting a search incident to an arrest at the same time that Nelson was being booked into the correctional facility.

The third factor set out in *McCoy*, that the arrest must not be a pretext for the search, is also satisfied. The *McCoy* court stated, "Where there is probable cause to arrest for a particular crime of a type which can be evidenced by items concealed on a person there is little danger of a pretext arrest." *McCoy*, 491 P.2d at 139. As we have previously mentioned, Nelson has never disputed the validity of his arrest.

Under the fourth requirement of *McCoy*, the arrest must be for a crime, evidence of which could be concealed on the defendant's person. Hair and fiber evidence is common and critical in sexual assault cases. It is clear from the record that it was standard police procedure to examine Nelson's clothes and person for evidence of sexual assault.

We conclude that Judge Cranston could properly find that the police seized Nelson's clothing pursuant to a search incident to an arrest. Accordingly, we conclude that Judge Cranston did not err in refusing to grant Nelson's motion to suppress.[3]

The conviction is REVERSED.

---

**3.** Our reversal of Nelson's conviction makes it unnecessary to reach the other issues which Nelson raises concerning his sentence.