Gary **NEWCOMB**, Appellant,

v.

**STATE of Alaska**, Appellee.

No. A–2477.

Court of Appeals of Alaska.

Nov. 9, 1990.

Sen K. Tan and Suzanne Weller, Asst. Public Defenders, and John B. Salemi, Public Defender, Anchorage, for appellant.

Nancy R. Simel, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and GONZALEZ, Superior Court Judge.*

## OPINION

BRYNER, Chief Judge.

Gary Newcomb was convicted by a jury of attempted murder in the first degree, assault in the first degree, two counts of misconduct involving weapons in the first degree, and escape in the second degree. Superior Court Judge Milton M. Souter sentenced Newcomb to a composite term of forty-six years and made the sentence consecutive to sentences that Newcomb was already serving on prior offenses. On appeal, Newcomb challenges his conviction on various grounds and contends that his sentence is excessive. We affirm.

## FACTS

On September 30, 1986, Newcomb escaped from the Wildwood Correctional Center near Kenai, where he was imprisoned after being convicted of robbery. About five months later, on March 3, 1987, the Anchorage Police Department received a report that Newcomb had been spotted at the Anchorage Barber College. Officers Preston Chapman and Francis O'Brien were dispatched. They encountered Newcomb at the college and attempted to arrest him. Newcomb struggled with the officers and managed to grab Chapman's service revolver. He shot Chapman in the buttocks and O'Brien in the shoulder. Newcomb then stood over Chapman and shot him a second time, apparently aiming for Chapman's head but hitting him in the neck. After firing another shot toward O'Brien, Newcomb fled. Other police officers captured Newcomb later that night.

## CHANGE OF VENUE

Newcomb's trial began in Anchorage on July 27, 1987. Prior to trial, Newcomb moved for a change of venue, arguing that pretrial publicity prevented him from receiving a fair trial in Anchorage. Superior Court Judge Victor D. Carlson denied the motion without prejudice to renewal if the jury selection process revealed substantial prejudice. Newcomb renewed his motion repeatedly during jury *voir dire*. Judge Carlson denied all the motions.

Newcomb contends that denial of his motion to change venue deprived him of his right to an impartial jury. The right to an impartial jury is secured by the sixth amendment to the United States Constitution:

> In all prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed....

A similar guarantee is embedded in article I, section 11 of the Alaska Constitution. In furtherance of these provisions, AS 22.15.-080(1) allows the trial court to change venue when "there is reason to believe that an impartial trial cannot be had...."

■ In deciding whether to change venue under AS 22.15.080(1), the trial court exercises broad discretion and is empowered, in almost all instances, to reserve decision until completion of jury *voir dire*. *See, e.g., Mallott v. State*, 608 P.2d 737, 746–47 (Alaska 1980); *Brown v. State*, 601 P.2d 221, 229–30 (Alaska 1979). Although this court, in reviewing the denial of a motion to change venue, has a "duty to make an independent evaluation of the circumstances," *Sheppard v. Maxwell*, 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966), we owe considerable deference to the trial court and may reverse only for abuse of discretion. *Oxereok v. State*, 611 P.2d 913 (Alaska 1980); *Brown*, 601 P.2d at 229–30; *Arnold v. State*, 751 P.2d 494, 500 (Alaska App.1988).

■ A defendant who seeks to change venue ordinarily bears the burden "to demonstrate that pretrial publicity actually resulted in 'a partiality that could not be laid aside' in those jurors finally seated to adjudicate guilt or innocence." *Mallott*, 608 P.2d at 748 (quoting *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975)). To meet this burden,

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

the defendant must do more than show that jurors have been exposed to pretrial publicity, since jurors need not be unaware of the facts of a case:

It is not required ... that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Thus, the defendant must normally prove a denial of the opportunity "to find twelve jurors 'who would, under the proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court.'" *Mallott*, 608 P.2d at 745–46 (quoting *Nebraska Press Association v. Stuart*, 427 U.S. 539, 569, 96 S.Ct. 2791, 2807, 49 L.Ed.2d 683 (1976)).

■ The normal rule requiring a showing of actual prejudice must be relaxed, however, when a case generates "intensive pretrial publicity" that results in "a substantial number of venirepersons [who] appear to have been prejudiced...." *Mallott*, 608 P.2d at 748. In these circumstances, "the probability that similar prejudices are shared by, but have not been extracted from, impaneled jurors," dilutes the reliability of the *voir dire* process and renders unrealistic the burden requiring the defendant to show actual prejudice. *Id.* For such cases, the Alaska Supreme Court, in *Mallott*, adopted the standard articulated in A.B.A. Standards Relating to the Administration of Justice:

A motion for change of venue or continuance shall be granted whenever it is determined that, because of the dissemination of potentially prejudicial material, there is a substantial likelihood that, in the absence of such relief, a fair trial by an impartial jury cannot be had.... A showing of actual prejudice shall not be required.

*Mallott*, 608 P.2d at 748 (quoting *Standards Relating to the Administration of Justice* § 8–3.3(c) (Approved Draft 1978)).

The *Mallott* standard applies to Newcomb's case. Newcomb's crimes received intensive pretrial publicity; from Newcomb's escape until the beginning of trial, at least thirty-three articles related to his case appeared in Anchorage newspapers. Additional articles appeared during jury selection and trial, and the case also garnered significant attention in the broadcast media. Moreover, of seventy-eight venirepersons subjected to *voir dire* in Newcomb's case, twenty-eight were excused for cause due to their exposure to pretrial publicity or their familiarity with various aspects of the case. In our view, the twenty-eight disqualified panel members amount to a "substantial number of venirepersons" for purposes of the *Mallott* standard.

■ Because Newcomb's case generated intensive pretrial publicity resulting in a substantial number of disqualifications, the trial court was obligated to grant Newcomb's motion to change venue *if it found a substantial likelihood that a fair trial by an impartial jury could not be had due to unrevealed prejudices harbored by Newcomb's panel. See Mallott* at 748. In contending that the trial court erred by refusing to change venue, Newcomb points to the twenty-eight prospective jurors who were disqualified due to pretrial publicity and notes that all but one of the jurors who actually deliberated had some knowledge of the case before the trial began. Newcomb argues that these numbers, in themselves, establish a substantial likelihood that he could not receive a fair trial.

The numbers relied on by Newcomb, however, while certainly relevant, are not

determinative. Standing alone, naked statistics provide little insight into the possibility of unrevealed jury prejudice. As we have already observed, jurors need not be unaware of the facts of a case in order to be impartial. *See Arnold,* 751 P.2d at 498. Decisions of the Alaska Supreme Court and this court suggest several factors beyond bare numbers that are relevant in gauging the likelihood of unrevealed jury prejudice and that must be considered in determining the need for a change of venue.

One significant factor is the precise nature of the pretrial publicity in a given case. The potential for unrevealed jury prejudice can be expected to increase when publicity is inherently prejudicial or inflammatory. Several types of publicity fall into this category. The paradigm is a report of a confession or of other significant evidence that is suppressed or otherwise inadmissible. *See, e.g., Chase v. State,* 678 P.2d 1347, 1351–52 (Alaska App.1984). Closely related are reports of important factual details that the defendant will actively seek to dispute at trial. *See, e.g., Arnold,* 751 P.2d at 499–500. Also included are emotionally charged editorials. *See, e.g., Mallott,* 608 P.2d at 747. This category further encompasses prejudicial accounts of the defendant's criminal history, particularly when such accounts are inaccurate. *See, e.g., Nelson v. State,* 781 P.2d 994, 997–98 (Alaska App.1989).

■ Another significant factor that our decisions show to be relevant in determining the potential for unrevealed jury bias is the timing of pretrial publicity. Even when jury *voir dire* establishes that most members of a panel have been exposed to highly inflammatory publicity, that exposure will be entitled to less weight if it appears that the passage of time has blunted its impact on the panel. *See, e.g., Mallott,* 608 P.2d at 747; *Chase,* 678 P.2d at 1351–52.

Finally, the nature of the community in which trial is had and the jury panel's familiarity with the trial participants have been deemed extremely significant factors. The greatest concern for the possibility of unrevealed jury prejudice understandably arises when crimes occur and are tried in small communities, where many prospective jurors have personal knowledge of the circumstances surrounding the offense or are acquainted with the defendant, the victim, or the principal witnesses. In such situations, adverse pretrial publicity is apt to have a particularly strong influence on prospective jurors. *See, e.g., Oxereok,* 611 P.2d 913; *Nelson,* 781 P.2d at 997–98; *Jerrel v. State,* 756 P.2d 301 (Alaska App. 1988); *Nickolai v. State,* 708 P.2d 1292 (Alaska App.1985).

■ In the present case, little of the extensive pretrial publicity was particularly inflammatory or inherently prejudicial. Most articles describing Newcomb's offenses conveyed information undisputed at trial. There were no reports of confessions, and little other information appeared that was not ultimately revealed during Newcomb's trial.

One significant exception was an article published shortly after Newcomb's arrest, which detailed his criminal history and reported statements characterizing Newcomb as a violent and dangerous criminal who had an antisocial personality. The potential prejudice from this publicity, however, was attenuated by the fact that Newcomb was charged, among other things, with escape and being a felon in possession of a handgun. It was thus inevitable that Newcomb's jury would learn that he had been imprisoned on a prior felony conviction, even though the details of his criminal history may have been inadmissible. It is of even greater significance that the prejudicial information was contained in an article published almost four months before Newcomb's trial. Only three prospective jurors questioned on *voir dire* recalled hearing any information about Newcomb's criminal background. Those jurors were excused for cause. Thus, while potentially highly prejudicial, this information appears to have had virtually no impact on Newcomb's trial.

Indeed, the great bulk of pretrial publicity concerning Newcomb's case occurred well before trial, either near the time of his escape nine months previously or—as with the article concerning his criminal history—

**940**

shortly after his arrest. As a result, only two jurors who sat for Newcomb's trial had more than a sketchy knowledge of the circumstances prior to trial. Both jurors who had more detailed exposure to pretrial publicity expressed confidence in their ability to judge the case exclusively on the evidence at trial.

Although most pretrial publicity occurred well before the beginning of trial, it appears that some members of the jury panel were exposed to publicity immediately before or during jury selection. This publicity was potentially prejudicial because it apparently pictured Newcomb in handcuffs. Nevertheless, it had minimal impact on the case. Only a limited number of panel members saw it. Most of those exposed professed an ability to remain impartial. Even so, all but one of the prospective jurors who had seen pictures of Newcomb in handcuffs were excused for cause. The one unexcused juror who had seen Newcomb in handcuffs was never challenged by Newcomb on this ground.

Finally, we believe it significant that Newcomb's trial was held in Anchorage, a relatively large community in which even extensive pretrial publicity can be expected to have limited impact. In Newcomb's case, the limited impact of the pretrial publicity is reflected in the jurors who actually served. As we have noted, only two members of Newcomb's jury had more than sketchy knowledge of the circumstances surrounding the case. Only one juror, moreover, was acquainted with any of the participants at trial; that juror had casual acquaintance with a minor medical witness for the prosecution. No jurors were acquainted with Newcomb, either of the injured officers, or any of the state's primary witnesses. Indeed, of the entire panel of prospective jurors who passed through *voir dire*, no one was personally acquainted with any principals in the case.

In short, all jurors who sat in judgment of Newcomb assured the court, under oath, that they could decide the issue of guilt or innocence based solely on the evidence presented at trial. Having independently reviewed the circumstances in Newcomb's

case, and giving due deference to the trial court's superior ability to observe and evaluate the demeanor of the prospective jurors during *voir dire*, we are unable to find that the court abused its discretion in declining to find a substantial likelihood that the assurances of impartiality given by Newcomb's jurors were unreliable. We conclude that the trial court did not err in denying Newcomb's motion to change venue.

## ADDITIONAL PEREMPTORY CHALLENGES

██ After a jury and four alternates were seated, Newcomb requested additional peremptory challenges. Judge Carlson denied additional challenges as to both regular jurors and alternates.

Newcomb argues that the trial court erred in denying his motions for additional peremptory challenges. In *Mallott*, 608 P.2d at 749–50, the Alaska Supreme Court encouraged trial judges to increase the number of peremptory challenges in cases involving extensive pretrial publicity. The court went on to adopt a special standard broadening the defendant's right to disqualify jurors for cause in a high publicity case. *Id.* (adopting *Standards for Criminal Justice* § 8–3.5(b) (Approved Draft 1978)).

In keeping with *Mallott*, this court has urged trial judges to freely allow additional peremptory challenges in high publicity cases, especially when challenges for cause involving close issues have been denied. In this regard, we have noted:

[I]n order to preserve a defendant's right to an impartial jury, the trial court may respond to a defendant's challenges of prospective jurors for cause in either one of two ways. First, the trial court may grant a defendant's challenges for cause in a liberal manner. Second, the trial court may decline to grant challenges for cause in a liberal manner so long as the court offers the defendant extra peremptory challenges.

*Jerrel*, 756 P.2d at 305. Accordingly, we have not hesitated to find an abuse of discretion when the trial court has refused

to allow additional peremptory challenges after denying a close challenge for cause. *See Nelson*, 781 P.2d at 998.

In the present case, however, our review of the record convinces us that none of the jurors who decided Newcomb's case came close to being subject to disqualification for cause, even under the broad standard adopted in *Mallott*. Indeed, apart from a generic challenge as to all members of the jury who had any prior knowledge concerning his case (a challenge that was quite properly denied), Newcomb failed to exercise a challenge for cause as to any juror who sat on his case.

Throughout jury *voir dire*, the trial court appears to have been quite flexible in granting Newcomb's challenges for cause. Of the individual challenges that Newcomb raised to venirepersons tentatively seated as regular jurors, Judge Carlson granted all but one; Newcomb subsequently challenged that juror peremptorily. Judge Carlson denied only two specific challenges for cause as to alternate jurors. Newcomb later challenged one peremptorily, and the other did not participate as a regular juror.

Considering the totality of the circumstances, we are satisfied that the trial court did not abuse its discretion in denying Newcomb's motions for additional peremptory challenges.

## COURTROOM SECURITY

As a security measure at trial, Judge Carlson required Newcomb to remain seated with his feet shackled and his left hand cuffed to a chain around his waist. To conceal Newcomb's restraints from the jury, the judge ordered skirting placed around the table at which Newcomb and his counsel sat. Identical skirting was installed on the table occupied by the state. During the trial, a non-uniformed officer was stationed inside the main courtroom door, within view of jurors.

■ Newcomb contends that these security measures violated his right to a fair trial. He relies on *Anthony v. State*, 521 P.2d 486, 495 (Alaska 1974), in which the court held that the defendant "should be

permitted to face the jury with the appearance and dignity of a free and innocent man." Nothing in *Anthony*, however, precludes the use of appropriate restraints in the courtroom when circumstances render them necessary and when reasonable efforts have been taken to minimize potential for prejudice. *See, e.g., Contreras v. State*, 767 P.2d 1169 (Alaska App.1989). *See generally* 3 W. LaFave & J. Israel, *Criminal Procedure* § 23.2 at 10–11 (1984).

■ In Newcomb's case, the trial court had abundant reason to exercise utmost caution to assure the safety of persons participating in and observing Newcomb's trial: Newcomb's extensive criminal history included convictions for serious crimes of violence. Newcomb was on trial for escaping from a correctional facility where he had been confined after conviction for robbery. He was also on trial for attempted murder and first-degree assault, offenses that allegedly occurred when Newcomb overpowered and shot two police officers who were attempting to arrest him for the escape. The combined efforts of six officers and a police dog were required to subdue Newcomb when he was ultimately taken into custody. At the time of trial, Newcomb already faced sentences totaling forty-three years as a result of prior convictions in Alaska and California. Conviction at trial would subject Newcomb to an additional lengthy sentence.

Although security measures taken by the trial court were undeniably substantial and subjected Newcomb to significant restraint, it is notable that the court took appropriate measures to mitigate potential prejudice. The guard stationed within view of the jury was in plain clothing, not in uniform. Photographs depicting the skirting placed around counsel tables establish that the physical restraints on Newcomb were effectively concealed from jurors in a manner that preserved courtroom decorum.

Newcomb may be correct in arguing that some jurors could have surmised that he was physically restrained during the trial. That fact, however, is not determinative. Because Newcomb was charged with es-

cape, the jury knew that he was in prison for a felony when he broke out of the Wildwood Correctional Center. The jury also knew that he was charged with shooting two police officers who were trying to arrest him for the escape. Given these circumstances, the information that Newcomb was in custody during trial could hardly have come as a surprise to any thinking member of his jury, no matter how Newcomb was presented in the courtroom. Any juror who recognized that the skirting around the tables was meant to conceal Newcomb's physical restraints would have learned little that was not already apparent under the circumstances.

To assure basic fairness under the circumstances, the trial court was not required to undertake the wholly unrealistic task of convincing jurors that Newcomb had been released and was no longer in custody. Rather, the court was required to assure them that Newcomb was presented to the jury with an appearance of dignity and decorum in keeping with the presumption of innocence. Our review of the record convinces us that this goal was met and that Newcomb was not denied his right to fundamental fairness.[1]

### SEVERANCE OF CHARGES

Over Newcomb's objection, the superior court ordered all charges against Newcomb joined for trial. Newcomb contends that the court erred in failing to order separate trials. Under Alaska Criminal Rule 8(a)(3), initial joinder is permissible when, among other things, charges are "based on two or more acts or transactions connected together...." Here, the obvious nexus between Newcomb's escape charge and the charges arising from subsequent efforts to apprehend him was certainly sufficient to warrant joinder of the

1. Newcomb raises two additional points in connection with the measures adopted by the superior court to assure courtroom security. He contends first that the court violated his right to be present at all stages of trial by holding an *ex parte, in camera* hearing for purposes of deciding the security measures to be used during trial. Shortly before trial, the state requested a hearing on the issue of courtroom security. Judge Carlson granted the request. Without notice to Newcomb or his counsel, the court held a hearing at which the prosecution presented several witnesses whose testimony generally aimed at establishing that Newcomb was contemplating another escape attempt. At the conclusion of the hearing, Judge Carlson adopted the security measures that were ultimately imposed on Newcomb, indicating that, regardless of the evidence presented at the *ex parte* hearing, he would have concluded that the same precautions were necessary.

On appeal, the state concedes that this hearing was a stage of trial and that Newcomb's absence from the hearing violated Alaska Criminal Rule 38. Further, as the state acknowledges, *Anthony*, 521 P.2d at 496, makes it clear that Newcomb was entitled to notice and an opportunity to be heard on the issue. The state nevertheless argues that any error was harmless beyond a reasonable doubt. While we do not condone the manner in which the trial court handled the courtroom security hearing, we must agree with the state that the error was harmless beyond a reasonable doubt.

Both common sense and the express findings of the trial court support the conclusion that measures similar to those actually adopted after the *ex parte* hearing would have been necessary even if Newcomb had been present to argue the issue. More significantly, it is undisputed that the scope of the *ex parte* hearing was limited to the narrow issue of courtroom security. This issue is wholly collateral to the basic question of guilt or innocence. We have already concluded that the security measures applied in Newcomb's case did not deprive him of his right to fundamental fairness. Thus, even if we assumed that Newcomb's presence at the *ex parte* hearing could have resulted in a more favorable arrangement for handling security at trial, we would have no basis for finding any reasonable possibility that Newcomb's absence from the hearing affected the jury's verdict. In our view, the collateral nature of the issue considered at the hearing presents a situation which, though factually distinguishable, is analogous to that considered in *Dolchok v. State*, 639 P.2d 277 (Alaska 1982) (improper exclusion of defendant from a hearing deemed harmless when the only issue considered was a question of law). *See also Trudeau v. State*, 714 P.2d 362 (Alaska App.1986).

Newcomb's second claim is that Judge Carlson should have been disqualified from presiding over the case in light of his participation in the *ex parte* hearing. However, judicial error on a procedural matter does not, in itself, establish a lack of impartiality warranting disqualification. *See, e.g., State v. Anchorage*, 513 P.2d 1104, 1112 (Alaska 1973). The party seeking to disqualify a judge must establish that the improper ruling was "the result of personal bias on the part of the judge which he developed from a non-judicial source." *Id.* Newcomb has made no such showing.

charges as being "connected together." See, e.g., Maynard v. State, 652 P.2d 489, 491 (Alaska App.1982); United States v. Ritch, 583 F.2d 1179, 1181 (1st Cir.1978).

Because his charges were subject to initial joinder, Newcomb bore the burden of establishing grounds for severance. Severance is governed by Alaska Criminal Rule 14, which provides:

If it appears that a defendant or the state is prejudiced by a joinder of offenses ... for trial together, the court may order ... separate trials....

■ Newcomb argues that he was entitled to automatic severance under the holding in Stevens v. State, 582 P.2d 621, 628 (Alaska 1978). However, the rule of automatic severance adopted in Stevens applies only when the sole basis for joinder is the similar nature of the charges. See Alaska R.Crim.P. 8(a)(1). Because Newcomb's charges were properly subject to joinder as connected acts under Criminal Rule 8(a)(3), Stevens was inapplicable. To be entitled to severance under Criminal Rule 14, Newcomb must show actual prejudice from joinder. Cleveland v. State, 538 P.2d 1006, 1008–9 (Alaska 1975).

■ Newcomb fails to meet this burden. Newcomb merely asserts that evidence of his Kenai and Anchorage charges would not have been cross-admissible in separate trials. The relevant question, however, is whether Newcomb suffered actual prejudice by joinder. Severance of charges is required when a lack of cross-admissibility creates an appreciable risk of actual prejudice from joinder. See Mathis v. State, 778 P.2d 1161 (Alaska App.1989); Elerson v. State, 732 P.2d 192, 195 (Alaska App.1987). A lack of cross-admissibility, however, does not inevitably result in prej-

udice. The likelihood of prejudice must be evaluated on a case-by-case basis.

In this case, evidence concerning Newcomb's escape would obviously have been admissible on the issues of intent and motive had his Anchorage charges been severed from the escape charge. While evidence of Newcomb's Anchorage crimes may not have been admissible in a separate trial on the escape charge, it is not at all clear that a jury's awareness of the Anchorage charges would have prejudiced its consideration of Newcomb's guilt. Newcomb's only defense to the escape charge was highly technical. He maintained that the state had neglected to prove that the Wildwood Correctional Facility was a place of official detention for purposes of the escape statute or that he was confined at Wildwood pursuant to an order of the court—also a requirement of the escape statute. See AS 11.56.310.

Because Newcomb effectively acknowledged being in custody at the Wildwood Correctional Facility and breaking out, it is highly unlikely that the jury would have used the evidence of Newcomb's subsequent bad acts to draw the impermissible inference that he had a propensity to engage in the type of conduct alleged in the escape charge. Thus, it does not appear that the jury's ability to decide Newcomb's guilt or innocence on the escape charge was substantially prejudiced by joinder of that charge with the Anchorage charges. We find no error in the trial court's failure to order severance of the charges.

## SENTENCING

■ Judge Souter sentenced Newcomb to terms totaling forty-six years for his offenses.[2] This composite term was made

**2.** Shortly before Newcomb's case was submitted to the jury, Newcomb moved to disqualify Judge Carlson as the result of an ex parte contact between the judge and an attorney in the Office of Special Prosecutions and Appeals. The motion was referred to Superior Court Judge Mark C. Rowland. Judge Rowland found no actual bias but concluded that the ex parte contact had created an appearance of bias warranting disqualification. Judge Souter was subsequently assigned to Newcomb's case and presided at the sentencing hearing.

Judge Souter found Newcomb to be a third felony offender for presumptive sentencing purposes and found five aggravating factors applicable to his case. Based on these findings, the judge imposed the following specific sentences: for attempted murder in the first degree, which carried a fifteen-year presumptive sentence, a sentence of twenty years; for assault in the first degree, with a fifteen-year presumptive term, a term of eighteen years; for one of the counts of first-degree misconduct involving a weapon,

consecutive to sentences that Newcomb had previously received for offenses in California and Alaska. Newcomb argues that his forty-six year sentence is excessive, particularly because it was imposed consecutively to his prior sentences.

In imposing Newcomb's sentence, however, Judge Souter expressly found that "[t]here is virtually no one who could be deemed more dangerous." Noting that Newcomb had "established a track record of violence," the judge concluded that Newcomb had virtually no prospects for rehabilitation and that it was necessary to make isolation the primary sentencing goal.

The record supports these findings. Newcomb easily qualifies as a worst offender, both on the basis of his background and the seriousness of his conduct in committing the current offenses. At thirty-seven years of age, Newcomb is not a youthful offender. His extensive criminal record includes prior convictions for voluntary manslaughter, attempted murder, robbery, and kidnapping. Prior attempts at rehabilitation have had no apparent success. In the present case, Newcomb's conduct was plainly among the most serious in its class. Newcomb escaped from the Wildwood Correctional Facility, where he was confined for service of a lengthy felony sentence. He managed to remain at large for an extended period of time. While at large, he secured and carried a handgun. When two police officers attempted to arrest Newcomb for escape, Newcomb resisted their efforts. He came perilously close to succeeding in a deliberate and cold-blooded attempt to murder one of the officers and shot the other. Both officers were severely wounded.

In our view, Newcomb's extensive history of criminal violence and the seriousness of his current criminal acts place him in the class of exceptionally dangerous offenders for whom virtual lifetime confinement is necessary in the interest of public safety. *See, e.g., Contreras,* 767 P.2d at 1175; *Wortham v. State,* 689 P.2d 1133 (Alaska App.1984). Having independently reviewed the entire sentencing record, we conclude that the sentences imposed below were not clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

The judgment is AFFIRMED.

which carried a three-year presumptive term, a five-year term; for the other count, a four-year term; and, for the second-degree escape, which was subject to a six-year presumptive term, a term of eight years. Judge Souter imposed the attempted murder and first-degree assault sentences consecutively. He imposed the sentences for misconduct involving weapons concurrently to each other and to the attempted murder and assault sentences. The sentence for escape was imposed consecutively, for a forty-six year total, all of which was made consecutive to Newcomb's previous sentences, which totaled an additional forty-three years.